[L.A. No. 29760. In Bank. July 26, 1971.]

FRED W. BENSON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Hitt & Murray and Anthony Murray for Petitioner.

F. LaMar Forshee, Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be disbarred.

*Facts:* Petitioner was admitted to practice law in California on June 10, 1959, and was employed in the office of the District Attorney of Los Angeles County from 1959 to 1960. Beginning in about 1961, he became closely acquainted with Pierce F. Carney and his wife, Violet Carney, and started to act as their attorney. In February 1962, at petitioner's request, the Carneys lent him $10,000 to use in furnishing his office. Petitioner gave the Carneys a promissory note for that amount, due in five years or on demand, with interest at 6 percent per annum payable annually.

In April 1962, petitioner asked the Carneys to lend him an additional $5,000, and they did so. On April 27, 1962, he destroyed the February 1962 note for $10,000 and gave the Carneys a new note for $15,000, payable in five years, with interest at 6 percent per annum payable an-

nually. On February 19, 1963, he paid them $900 as interest on the new note. This was the only payment he made on the $15,000 note.

During 1963, petitioner told the Carneys that he also represented a man named Jebia. He said Jebia was a very wealthy businessman involved in the warehousing of bananas and that an arrangement could be made under which if persons would deposit in a savings and loan association account sums of money which Jebia could use and invest, Jebia would pay such investor 8 percent interest on the money deposited, and the investor would also receive the regular 4.75 percent interest paid by the savings and loan association, giving a total return of 12.75 percent per annum. Petitioner further told the Carneys that although the money would be used by Jebia, it would have to be deposited in petitioner's name.

On October 15, 1963, relying upon petitioner's representations regarding the proposed Jebia transaction, Mrs. Carney gave petitioner a check for $20,000. The Carneys believed that petitioner would deposit the money in a savings and loan association account for the investment with Jebia. Mrs. Carney testified with respect to the transaction, "We trusted [petitioner] and we believed that he would do whatever had to be done and whatever was right."

According to petitioner's testimony, Jebia had told him he would show petitioner a "proper investment" if petitioner raised $40,000, and petitioner needed the $20,000 from the Carneys to complete the required $40,000. Petitioner stated, "When Jebia found out that I had borrowed the money he would not let me invest it, and that started my road to ruin, I guess, as you call it."

Petitioner admitted that he did not explain to the Carneys what had happened or offer to return the $20,000. He testified that he deposited the money in his "open" account at the Harbor Savings and Loan Association, in which he then had about $20,000 of other funds; that his office was in the same building and he later withdrew the Carneys' $20,000 from his account at various times, making withdrawals as he needed money; and that before he knew it, the money was gone. He also stated, ". . . I think I did everything to bend over backwards *not* to tell the Carneys *these were trust funds*." (Italics added.)

Some time after turning the $20,000 over to petitioner, the Carneys asked him for a "note of agreement" between Jebia and themselves, so that they would have something to show for the money they had invested. Petitioner told them, in April 1964, that "there would be no way of his having a note between [the Carneys] and Jebia, it would have to be between [the Carneys] and [petitioner]." He also told them that he would

combine the amounts they had first lent him, plus the interest due, with the $20,000 invested with Jebia, for a note in the total sum of $37,460 bearing 10 percent interest.

On April 18, 1964, petitioner gave the Carneys a note for $37,460, payable in five years, at 10 percent interest annually. He also gave them a summary sheet, which he used to show them that if they left their money "in" and allowed it to accrue with interest, in five years they would be able to receive the total sum of $60,329.71. He further told them that interest could be paid at any time in six-month periods, that they would not be allowed to draw out anything in between, but that at the end of six-month periods they could draw "either the interest or the full amount, whatever [they] wanted."

Mrs. Carney testified that they did not ask petitioner for interest again until April 1966, at which time they "had to have money" and asked petitioner if he would pay them at least $3,000, or approximately one year's interest; that petitioner told her at that time that she was a day or two over the six-month period, "just too late to come in on that period and [she] would have to wait again until the October date when it would be due again and then [she] would be able to get the $3,000"; that in October 1966 they again asked petitioner for the $3,000; that because of the way he answered and equivocated, she finally asked him "if he had really invested that money for the full five years rather than on a six month basis"; that petitioner said "yes," he had "put it in for a full five years period with the understanding he wouldn't touch it until the end of the five years period"; that she and her husband continued, after October 1966, to ask petitioner for a $3,000 payment, which they "needed very badly"; and that petitioner kept saying he would be able to make payments to them from his own money that he had "coming in." It is undisputed, however, that petitioner made no payments at that time.

Mr. Carney testified that he, also, had conversations with petitioner relating to the Jebia investment after October 15, 1963, when the money was turned over to petitioner; that "at different times" petitioner claimed he "was making plenty of dough, kidding along about it, until it finally came to a showdown . . ."; and that the "showdown" occurred during the fall of 1967, when petitioner came to the Carneys' home at Palm Desert.

The Carneys testified that at that time petitioner "finally confessed" that their money had never been invested by him with Jebia and that he himself had spent the money. With respect to the conversation, Mrs. Carney stated: "Well, I was the one that brought the subject up. I said, 'Fred [petitioner], tell us the truth now, you really have never invested that money, it's never been invested with Mr. Jebia, has it, you have

spent it yourself?' and he said, 'Yes, that's true.' " She further testified that when they pressed petitioner concerning how he had spent the money, he could not say specifically, but he did say he had used some of it to buy a house for his father.

Mrs. Carney further testified that while petitioner was at their home in the fall of 1967, they told him that instead of requiring him to pay the full amount due (which was about $56,000), they would be willing to settle for $50,000 at 6 percent and have him amortize the loan in monthly payments he could meet. Petitioner then agreed to a new arrangement and gave the Carneys his promissory note dated October 1, 1967, for $50,000, bearing 6 percent interest, with principal and interest payable in monthly installments of $966.65 until the full amount had been paid.

Mr. Carney testified that when petitioner was at their home in the fall of 1967, he gave them a check for $1,900, but he called back and told them not to put it in "before Monday" and finally admitted that the check was "a rubber check and . . . no good."

Thereafter, petitioner made three payments of $966.65 each, one on November 1, 1967, one on December 4, 1967, and the third on January 7, 1968. On July 30, 1968, he called the Carneys from San Francisco, telling them that he had $1,000 for them; but on August 2, 1968, he wired them only $200. The foregoing payments total $3,099.95.

At the hearing before the local administrative committee, petitioner admitted that he had not proposed or thought of any plan for repayment to the Carneys. He sought to excuse his failure to do so, saying he felt he could not talk with them, since they had employed other counsel. He apparently did not seek to communicate with their counsel.

At the conclusion of the hearing, petitioner made certain representations to the committee indicating a determination to repay the Carneys in full. Petitioner then stated that he was still in private practice and that: ". . . [I]t's going well . . . . [I]f the Committee wants to know do I feel I have sufficient practice to start repayment the answer is yes." He further represented that he was not supporting anyone else and that starting the end of January 1970 he had "in mind" payments to the Carneys of $500 a month and later perhaps more. Petitioner has submitted no evidence, however, of any restitution to the Carneys since August 1968.

Petitioner first sought to explain the reason for his misconduct, as follows: "As Mrs. Carney explained I did tell her that I put a down payment on my father's house, which has been since foreclosed against, but the only explanation I could give them is what I will give the Board

is I was an officer in the South Bay Bar Association with about 300 attorneys; I was on the Board of Los Angeles County Bar Association for three years, the extra year because they changed over to fiscal years; I was on the Methodist pulpit every Sunday; I was Chairman of the Charter Commission to rewrite the charter of the City of Redondo Beach. *I spread myself much too thin. I tried to keep my law practice coming up.* I don't know how I went as far as I did, and as Mrs. Carney said before I knew it the money was gone . . . ." (Italics added.)

In his subsequent testimony, petitioner stated: "I overlooked it while I was testifying, something that the Carneys are aware of. I'm not putting myself out as a paragon of virtue. I don't smoke, I don't drink, I don't run around. None of this money went for those purposes. I fell in love in 1963 with a school teacher at Kema Meha School in Honolulu, and *I kept a home in Honolulu and commuted to Honolulu with the idea of passing the Bar, which I did in November of '64, and kept a home and office both in Honolulu and in Los Angeles, and the financial drain is obvious,* but the Carneys were aware of the situation. I should have probably brought this up. They cautioned me several times I probably shouldn't be doing this. In fact they stayed at my home in Honolulu once. I think it's important because *it was a source of where a lot of money went.* She married someone else, so I'm still single." (Italics added.)

The local administrative committee concluded that petitioner had violated sections 6103 and 6128 of the Business and Professions Code and rule 9 of the Rules of Professional Conduct. The committee recommended that petitioner be suspended from the practice of the law for five years but that the suspension be stayed and petitioner placed on probation for five years with a one-year actual suspension and other conditions providing for restitution of his clients' funds and reporting to the State Bar. The Disciplinary Board, however, by a vote of 10 to 4, recommended that petitioner be disbarred.

The above recital of facts shows clearly that petitioner violated his duty to his clients, and he acknowledges that he should be disciplined for his conduct. He contends, however, that disbarment, as recommended by the Disciplinary Board, is "manifestly excessive" discipline. Petitioner did not appear before the Disciplinary Board, since he acquiesced in the recommendation of the local administrative committee and mistakenly believed that that recommendation would be affirmed if uncontested.[1]

Admittedly, petitioner's misappropriation of his clients' $20,000 is a most grievous breach of professional ethics and morality; and dis-

---

[1]Petitioner should have filed a conditional acceptance of the local administrative committee's report under rule 38.5 of the Rules of Procedure of the State Bar (following Bus. & Prof. Code, § 6087).

barment is the usual discipline in a case involving an attorney's misappropriation of a client's funds in the absence of strong mitigating circumstances. (See *Demain* v. *State Bar,* 3 Cal.3d 381, 387 (5) [90 Cal.Rptr. 420, 475 P.2d 652].) Petitioner, however, directs attention to the fact that he gave the Carneys a promissory note evidencing his indebtedness to them for all the amounts advanced, plus the interest they were to have received from Jebia and the savings and loan association, and that he actually made payments on the note long before these proceedings began. He argues that such a note, strong evidence that he had personally used the money and felt personally obligated to repay it, would not have been given by a man who planned permanently to deprive his clients of their money and to conceal from them the true facts.

Petitioner also points to his background in the practice of law and his standing and work in local and county bar associations, urging that his exemplary general conduct in these fields should be regarded as a strong qualification for a rehabilitative kind of discipline. At the same time, he argues that some weight should be given to the fact that he was acting under the stress of too many organizational commitments and the strain of financial and personal problems.

Petitioner makes the further argument that disbarment is too severe a discipline, because he has no prior disciplinary record. ▮ Disbarment is not reserved for attorneys with prior disciplinary records. (See, e.g., *Tardiff* v. *State Bar,* 3 Cal.3d 903 [92 Cal.Rptr. 301, 479 P.2d 661].) ▮ However, petitioner's other arguments, buttressed by the fact that the local administrative committee concluded that suspension would be adequate discipline, have persuaded this court that suspension, as recommended by the local administrative committee, rather than disbarment, as recommended by the Disciplinary Board, is the proper discipline for petitioner. In reaching this conclusion, we have considered the fact that petitioner personally appeared and testified before the local administrative committee but did not do so before the Disciplinary Board and that the Disciplinary Board was divided 10 to 4 in its recommendation. Under all the circumstances, we have concluded that the local administrative committee's recommendation should be followed. (Cf. *Medoff* v. *State Bar,* 71 Cal.2d 535, 546 [3] [78 Cal.Rptr. 696, 455 P.2d 800].)

It is ordered that petitioner be suspended from the practice of law for a period of five years. Execution of such suspension is stayed for the period of five years, during which period he is placed on probation upon the following conditions: that he is suspended for the first year and that he comply with the conditions set forth in the "Findings of Fact, Conclusions and Recommendation" of Local Administrative Committee No.

Fourteen of the County of Los Angeles, dated January 21, 1970, which conditions are hereby adopted as part of the order of this court. This order is effective 30 days after the filing of this opinion.