[L.A. No. 30274. In Bank. Feb. 25, 1975.]

FRED W. BENSON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Hitt, Murray & Caffray and Anthony Murray for Petitioner.

Herbert M. Rosenthal and Ronald W. Stovitz for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review a recommendation of the State Bar Disciplinary Board that petitioner be disbarred from the practice of law in California.[1]

Petitioner was admitted to practice law in 1959. He was employed in the office of the Los Angeles District Attorney from 1959 to 1960. In 1961 he entered private practice, and in 1962 opened his own law office in Redondo Beach. He worked until 1969, when he voluntarily discontinued his practice in the face of pending State Bar proceedings. Those proceedings, charging violation of sections 6103 and 6128 of the Business and Professions Code and rule 9 of the Rules of Professional Conduct, culminated in 1971 in our decision suspending petitioner from the practice of law for five years with one year actual suspension and the remaining four years on probation. (*Benson* v. *State Bar* (1971) 5 Cal.3d 382 [96 Cal.Rptr. 30, 486 P.2d 1230].)

---

[1]The disciplinary board voted eight to five in favor of disbarment. The five dissenting members expressed the opinion that the degree of discipline recommended was excessive. Two of the dissenting members favored the recommendation of the local administrative committee, i.e., that petitioner's probationary period be extended five to ten additional years, and that the conditions of probation be amended to include restitutive payments to those persons injured by the misconduct with which he is charged in this proceeding.

The charges which form the basis of the State Bar proceeding we review today were brought subsequent to our decision in the first proceedings, but concern conduct which petitioner engaged in prior to those proceedings. None of the charges relates to petitioner's conduct since 1969, except insofar as he has met or failed to meet his obligations to make restitution to persons injured by his earlier conduct.[2]

We first consider the two specific incidents of misconduct now charged, and second, briefly summarize and review the former disciplinary proceedings and their relevance *vel non* to the present matter. Third, we consider the State Bar's contentions that petitioner has failed to make restitution except where closely supervised, and fourth, review the recommendations of discipline.

*The Stirratt Loans.* It is undisputed that petitioner borrowed $25,000 from Mr. and Mrs. Stirratt in February 1967, and an additional $6,000 from them in October 1967. It is also undisputed that he has repaid, at most, only $3,700 of the $31,000 owing on these loans. Moreover, Mrs. Stirratt has obtained a default judgment for fraud against petitioner after his wilful failure to answer interrogatories in a lawsuit she brought to recover the amount owed. (Stirratt v. Benson, L.A. Super. Ct. No. 946227, filed Jan. 31, 1974.)[3] According to the record petitioner has not paid any part of that judgment.

The local administrative committee and the disciplinary board—whose findings with respect to the Stirratt loans are identical—determined that in mid-1965 Mrs. Stirratt retained petitioner to represent her and her minor sister in an action to recover damages for the wrongful death of their parents. Petitioner referred the wrongful death matter to Lowell Dryden, an attorney specializing in accident work, but continued to represent Mrs. Stirratt in the matter of her parents' estate and in arranging the guardianship of her minor sister. According to Mrs. Stirratt, petitioner handled the estate from mid-1965 until late 1966. The wrongful death case was settled in late 1966 for approximately $130,000. Petitioner believed Mrs. Stirratt's portion of that settlement to be $30,000 and her minor sister's portion $100,000, less legal fees. Mrs. Stirratt testified that petitioner continued to represent her in the guardianship

---

[2] The State Bar maintains that its informal records show these charges did not come to its attention until September 20, 1971, i.e., after this court's opinion in the prior proceeding became final.

[3] We take judicial notice of that action. (Evid. Code, § 452, subd. (d); *Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 444 [113 Cal.Rptr. 602, 521 P.2d 858]; *Lee* v. *State Bar* (1970) 2 Cal.3d 927, 940-941 [88 Cal.Rptr. 361, 472 P.2d 449].)

matter, by looking for different ways to invest the funds belonging to her minor sister.

Petitioner, on the other hand, testified that he did not tell Mrs. Stirratt he would act as an investment counselor for her, and that he did not recall whether he began acting as her attorney in the guardianship matter before or after he requested the first personal loan from the Stirratts.

The local administrative committee and the disciplinary board concurred in finding that when petitioner borrowed $31,000 from Mrs. Stirratt, he was serving as her attorney "individually and as Guardian of Miss Logan," her minor sister. Petitioner does not contest the sufficiency of the evidence to support this finding.

The local committee and the board also found that petitioner falsely represented to Mrs. Stirratt "that such a loan to him would be a good investment; that he would pay 8% interest; that this was a better return than she could get elsewhere; that the proper way for her to be protected would be for him to sign an unsecured promissory note; that he was solvent at the time; and that he had the ability to repay said funds in one year." Petitioner contests the sufficiency of the evidence to support this finding.

■■ We are not bound by the findings of the local committee or the board, but rather must exercise our independent judgment on the weight and sufficiency of the evidence. (*Glickman* v. *State Bar* (1973) 9 Cal.3d 179, 184 [107 Cal.Rptr. 65, 507 P.2d 953]; *In re Fahey* (1973) 8 Cal.3d 842, 845 [106 Cal.Rptr. 313, 505 P.2d 1369]; *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 916 [101 Cal.Rptr. 369, 495 P.2d 1289].) We turn therefore to an evaluation of the support in the record for these findings, bearing in mind the deference we customarily afford to findings resting primarily on testimonial evidence (*Vaughn* v. *State Bar* (1972) 6 Cal.3d 847, 852 [100 Cal.Rptr. 713, 494 P.2d 1257]; *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]), our announced policy of resolving close questions in favor of the accused (*Belli* v. *State Bar* (1974) 10 Cal.3d 824, 829 [112 Cal.Rptr. 527, 519 P.2d 575]; *In re Fahey, supra,* at pp. 845-846), and our rule that the accused must bear the burden of showing the record does not support the finding that he violated his oath and duties as an attorney *(Himmel* v. *State Bar, supra).*

Petitioner was heavily in debt, and insolvent, at the time he approached the Stirratts for these loans.[4] Nevertheless, according to Mrs.

[4]The record indicates that when petitioner asked Mrs. Stirratt for the first loan his

Stirratt's testimony, when the subject first came up she and petitioner were "discussing about some investments for my sister's guardianship," and petitioner told her he needed a loan "because some of his fees hadn't come in at that time and that at that point Mr. Dryden had passed away and that he hadn't received his portion of the [Stirratt] insurance claim [from Mr. Dryden] at that time and that he was short." In requesting the second loan, petitioner told her that he was "in a little financial trouble, nothing to worry about. He needed something to tide him over until the end of the year. He made very light of it."

Both Mrs. Stirratt and petitioner concurred in their testimony that he advised her the loan monies could not come from the minor sister's funds, but would have to come from Mrs. Stirratt's funds. Their testimony also agreed with respect to the fact that petitioner offered her 8 percent interest and that he tendered unsecured promissory notes at 8 percent interest with the understanding that the "on demand" payment provision could be exercised in one year.

As petitioner contends, however, there is no testimony to the effect that he expressly told Mrs. Stirratt the unsecured promissory note was adequate protection. On the other hand there is ample evidence to support the conclusion that petitioner deliberately and wilfully misled Mrs. Stirratt into assuming that the loans would be a good investment for her and that petitioner was solvent and capable of making repayment in a year. Furthermore, given the fiduciary nature of petitioner's relationship with Mrs. Stirratt, it can be fairly inferred that his suggestion of an unsecured promissory note met with her approval because she trusted his judgment. The gravamen of the charge is abuse of that trust, and regardless of petitioner's contention that he never specifically recommended the unsecured loans to Mrs. Stirratt, it is undisputed that in soliciting them he failed to reveal the extent of his preexisting indebtedness and financial distress.

■ This court has often stated that "The relationship between an attorney and client is a fiduciary relationship of the very highest character. All dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness. [Citation.] It is incumbent upon the attorney to show that the dealings are fair and reasonable and were fully known and understood by the client. The burden is on the attorney to show that

---

current and long-term personal indebtedness totaled approximately $184,000. At that time he was already overdue in repaying several other personal loans, and was counseling with an attorney about his financial problems.

the transaction between them was 'at arm's length.' [Citation.]" (*Clancy v. State Bar* (1969) 71 Cal.2d 140, 146-147 [77 Cal.Rptr. 657, 454 P.2d 329].) We conclude that petitioner violated his fiduciary duties as an attorney; he has not met the burden of demonstrating the contrary.

Furthermore, petitioner's conduct in failing to repay the loans, although not discussed in detail in the findings below, exacerbated the injury Mrs. Stirratt suffered. According to her testimony, she notified petitioner in November 1967 that she and her husband would expect the $25,000 note to be repaid when the year was up in February 1968 because her husband was attending school full time and they needed the money. Petitioner stalled repayment despite her repeated reminders, and then in late March 1968 tendered an invalid check for $2,216.71 on an account which had been closed. In April 1968 he informed Mrs. Stirratt that she owed him $3,000 from the minor sister's guardianship funds for legal and accounting services. Mrs. Stirratt withdrew $3,000 from the minor's account and paid petitioner, who immediately returned the money to her as payment on the prior loans. Petitioner did not request or receive court approval for withdrawing this $3,000 fee from the minor's funds.

Mrs. Stirratt continued her requests for repayment, and in October 1968 sought legal advice. The attorney she consulted agreed to act as a mediator, and drew up an agreement which both Mrs. Stirratt and petitioner signed providing for monthly installment payments of $1,000 by certified check. Petitioner made only two payments, one via a second-party check for $500, and the second in the amount of $194.41.

In January 1969 Mrs. Stirratt filed a civil action for damages against petitioner, alleging he had recommended the loan by falsely, fraudulently, and deceitfully representing to her that it would be a good investment for her and that he was solvent in his business and personal affairs and would be able to repay the loan within one year. Petitioner filed a verified answer in March 1969, admitting the indebtedness but denying any acts of fraud. Petitioner was subsequently sanctioned for wilful failure to answer interrogatories, and a default judgment for fraud was entered against him. The court awarded Mrs. Stirratt $30,327.78 principal, $13,121.06 interest, $10,000 exemplary and punitive damages, and $40 costs. These sums are still owing.

The local administrative committee concluded not only that petitioner violated his oath and duties as an attorney (Bus. & Prof. Code, § 6103)

but also that he committed acts involving moral turpitude (Bus. & Prof. Code, § 6106). Our independent examination of the record convinces us these conclusions are correct with respect to the Stirratt loans.

*The Woolley Loan.* The second of the two charges against petitioner involves an outstanding loan of $5,500 made by Boris Woolley and his wife at petitioner's request in May 1968.[5] This loan was the subject of a default judgment for civil fraud against petitioner in the amount of $7,502.04, which he has failed to satisfy in whole or in part. (Woolley v. Benson, L.A. Super. Ct. No. 948383, filed Feb. 18, 1972.) ██ Woolley, unlike Mrs. Stirratt, is not and never has been a client or other person to whom petitioner owed a fiduciary duty. Rather, he is a practicing attorney. We decline, therefore, to apply the same rigorous standards in evaluating the transaction with Woolley that must be used in scrutinizing the loans from Stirratt, a client.

Both the local administrative committee and the disciplinary board found that petitioner misled Woolley into believing there was only a first and possibly a second trust deed on petitioner's Redondo Beach residence. Petitioner concealed from Woolley the fact that he had earlier given other creditors encumbrances on the same property as security for personal loans.

Petitioner alleges that the circumstances of the loan were otherwise. He testified he had disclosed all prior loans and encumbrances, and had shown Woolley an accounting sheet which listed all his financial obligations.

Because the evidence offered by petitioner and Woolley is in direct conflict on this point, we accept the findings of the local committee, which had the benefit of gauging the witnesses' demeanor and questioning them directly. *(Vaughn* v. *State Bar, supra; Himmel* v. *State Bar, supra.)* In this respect the findings of the local committee and the board are identical. The local committee specifically concluded that petitioner's misconduct respecting the Woolley loan constituted a violation of his oath and duties as an attorney (Bus. & Prof. Code, § 6103) and should be deemed an act of moral turpitude (Bus. & Prof. Code, § 6106).

We need not determine whether petitioner's conduct in soliciting the Woolley loan violated sections 6103 and 6106 of the Business and Professions Code. His continuing failure to repay that loan is more

---

[5] Petitioner's contention that he was deprived of full notice and an opportunity to defend because the Woolley loan count was imprecisely charged is without merit.

disturbing. As we noted above, however, the fiduciary duty which we conclude petitioner breached in his conduct towards his client Mrs. Stirratt was not an element in the transactions with Woolley. Hence our disciplinary conclusions are based primarily on his behavior in requesting and then failing to repay the Stirratt loans, and only secondarily on the Woolley loan.

As stated, this is not the first time questions concerning petitioner's conduct as an attorney have come before this court. In 1971 we reviewed a recommendation that petitioner be disbarred. Petitioner was there charged with violating sections 6103 and 6128 of the Business and Professions Code and rule 9 of the Rules of Professional Conduct. He had borrowed—without repaying—a total of $35,000 from his clients Pierce and Violet Carney. In 1963 the Carneys had lent him $20,000 of this sum on his representation he would invest the funds for their benefit in a particular venture so as to return more than 12 percent per year. Instead of returning the money when he was subsequently unable to invest it, he appropriated it for his own use and concealed this fact from the Carneys for approximately four years.

Petitioner admitted his wrongdoing in the prior proceeding, but argued in mitigation his lapse under the strain of excessive organizational commitments and personal and financial problems.[6] He also contended he had given promissory notes evidencing an intent to repay the clients, and still meant to do so.

We did not adopt the disciplinary board's disbarment recommendation in the previous case, and chose instead the recommendation of the local administrative committee that petitioner be suspended from the practice of law for five years, serving one year of actual suspension and the remaining four years on probation with certain conditions imposed.

As of this date petitioner has served his one year of actual suspension and two of the four additional years on probation. He made two annual restitutive payments of $5,000 to the Carneys, pursuant to the conditions of his probation, but is currently in arrears. Payments are long overdue on the default judgments obtained in the Stirratt and Woolley transactions.

---

[6]Petitioner testified that he fell in love with a Hawaiian school teacher; spent great sums of money maintaining residences and offices in both California and Hawaii and commuting between the two; that the school teacher married another man in 1967, disappointing petitioner; and that he was too heavily involved in civic and religious activities outside his law practice. (See *Benson* v. *State Bar, supra,* 5 Cal.3d at pp. 386-387.)

The State Bar contends that the discipline imposed in 1971 might well have been more severe had the Stirratt and Woolley loans come to light before that proceeding concluded. Petitioner, however, urges the same mitigating personal circumstances here that he argued in our 1971 review of the Carney matter.

The State Bar also urges that because petitioner has failed to make regular restitutive payments to the Stirratts and the Woolleys "the only reasonable conclusion . . . is that Petitioner will not make restitution unless subjected to long-term pressure from this Court to do so." It argues therefore for disbarment, reasoning that the lengthy probationary supervision recommended by the local administrative committee "seem[s] inconsistent with the high moral character and integrity which this Court deserves to expect from all attorneys it holds out to the public as fit to practice law." Petitioner, on the other hand, testified repeatedly to his intent to make restitution. He claims that he will make an effort to complete restitutive payments regardless of the outcome of this disciplinary review.

■ We are charged, in the review of disciplinary recommendations, with the protection of the public rather than the exercise of punitive judgment. (*In re Higbie* (1972) 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97].)

As we stated in the first *Benson* case (5 Cal.3d at pp. 387-388), "petitioner's misappropriation of his clients' $20,000 is a most grievous breach of professional ethics and morality; and disbarment is the usual discipline in a case involving an attorney's misappropriation of a client's funds in the absence of strong mitigating circumstances. (See *Demain* v. *State Bar,* 3 Cal.3d 381, 387 . . . .)" In *Benson* we found mitigating circumstances in our understanding that the misappropriation there was an isolated instance, that petitioner gave the victims a promissory note and had actually made payments on the note before the disciplinary proceedings began, and that his previous conduct in the practice of law and in the community had been exemplary.

■ While the Stirratt and Woolley transactions occurred prior to the previous disciplinary proceeding, unquestionably had we been aware then that misappropriation of funds had occurred in other transactions, suggesting not a momentary lapse by an emotionally distressed attorney but a more prolonged and deliberate course of conduct, we would have previously disbarred petitioner as recommended by the disciplinary board. We now take that step.

It is therefore ordered that Benson be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.