[L.A. No. 32163. July 2, 1987.]

JOHN EARL FRAZER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

John Earl Frazer, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review the recommendation of the State Bar Court that petitioner John Earl Frazer, who was admitted to practice in 1974, be disbarred.

The recommendation is based on findings involving 14 counts of misconduct stemming from petitioner's financial difficulties, severe depression and resulting unannounced closing of his office in Big Bear and disappearance from the area. In 11 of the matters, petitioner was found to have wilfully violated rule 2-111 of the Rules of Professional Conduct by withdrawing from employment without taking reasonable steps to avoid foreseeable prejudice to his clients and failing to return unearned fees in four of the matters.[1] In eight instances petitioner was found to have wilfully violated rule 6-101(2) by failing to use reasonable diligence to accomplish, with reasonable speed, the purpose for which he was employed. Three matters involved loans obtained from clients in violation of rule 5-101, and one involved a loan from a nonclient in which petitioner misrepresented the security inter-

---

[1] Unless otherwise noted, all references hereafter to rules are to the Rules of Professional Conduct of the State Bar.

est to be given. Petitioner was found to have committed acts of moral turpitude in three of the loan transactions.

Before proceeding to the details of petitioner's challenges to the findings, we must address two contentions which are broader in scope. First, petitioner contends he was denied due process as a result of the hearing panel's refusal to continue the date of the first day of hearings to enable his retained counsel to be present. Second, he contends that his conduct should have been judged by the new version of rule 6-101 (effective Jan. 1, 1983) rather than the one in effect at the time of his charged conduct.

### Continuance Request

Petitioner's counsel, Godfrey Isaac, learned of the October 17, 1983, hearing date about a week beforehand. At that time he called the State Bar hearing examiner to request a continuance because he was engaged in a trial and would be unable to appear on that date. The examiner refused on the ground that he had already subpoenaed witnesses for that date and that the State Bar's position was that State Bar Court proceedings should have equal priority with proceedings in civil courts. The request was then presented to the principal referee, who also denied it.

Petitioner appeared on October 17 with Mr. Isaac's associate, Ms. Marks, who repeated the request for a continuance. The hearing panel denied the request on the ground that it had previously been denied by the principal referee and that three witnesses were present, including one who had travelled a long distance.

The hearing proceeded with Ms. Marks representing petitioner that day. The record reveals that she was well-informed about the facts and charges. Mr. Isaacs represented petitioner the rest of the time.

■ Petitioner relies on criminal cases in arguing that the denial of a continuance to obtain the presence of his retained counsel constituted a denial of due process. (See *People* v. *Gzikowski* (1982) 32 Cal.3d 580 [186 Cal.Rptr. 339, 651 P.2d 1145].) Although State Bar proceedings are said to be quasi-criminal in nature, they are not comparable to a criminal proceeding and do not invoke all of the rights afforded a criminal defendant. (See *Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 792 [205 Cal.Rptr. 834, 685 P.2d 1185].)

Were we ruling on the request in the first instance, we might have granted the continuance. Nevertheless, given the existence of subpoenaed witnesses and the availability of Isaac's associate to represent petitioner, we cannot

say that the denial of the request was an abuse of discretion or a denial of due process.

*Amendment of Rule 6-101*

■ Petitioner argues that his conduct should have been judged by the revised version of rule 6-101, which became effective January 1, 1983, rather than the version of the rule that was in effect at the time of his charged conduct. The version applied to petitioner read as follows: "A member of the State Bar shall not wilfully or habitually

"(1) Perform legal services for a client or clients if he knows or reasonably should know that he does not possess the learning and skill ordinarily possessed by lawyers in good standing who perform, but do not specialize in, similar services practicing in the same or similar locality and under similar circumstances unless he associates or, where appropriate, professionally consults another lawyer who he reasonably believes does possess the requisite learning and skill;

"(2) Fail to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning in an effort to accomplish, with reasonable speed, the purpose for which he is employed. [¶] The good faith of an attorney is a matter to be considered in determining whether acts done through ignorance or mistake warrant imposition of discipline under Rule 6-101."

The 1983 version of rule 6-101 reads: "(A)(1) Attorney competence means the application of sufficient learning, skill, and diligence necessary to discharge the member's duties arising from the employment or representation.

"(2) A member of the State Bar shall not intentionally or with reckless disregard or repeatedly fail to perform legal services competently.

"(B) Unless the member associates or, where appropriate, professionally consults another lawyer who the member reasonably believes is competent, a member of the State Bar shall not

"(1) Accept employment or continue representation in a legal matter when the member knows that the member does not have, or will not acquire before performance is required, sufficient time, resources and ability to, perform the matter with competence, or

"(2) Repeatedly accept employment or continue representation in legal matters when the member reasonably should know that the member does

not have, or will not acquire before performance is required, sufficient time, resources and ability to, perform the matter with competence.

"(C) As used in this rule, the term 'ability' means a quality or state of having sufficient learning and skill and being mentally, emotionally and physically able to perform legal services."

Petitioner asserts that the new version lessens the standard of culpability and that it should therefore apply to him under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948].[2] Under *Estrada* a defendant is entitled to the benefit of a statutory mitigation of punishment enacted before his judgment of conviction becomes final. This, however, is not a criminal case to which the full panoply of rights afforded a criminal defendant applies. (See *Palomo* v. *State Bar, supra,* 36 Cal.3d at p. 792.)

Moreover, it is not clear how petitioner would benefit even if rule 6-101 were found inapplicable to his conduct since each finding of violation of rule 6-101(2) was also accompanied by a finding that he violated rule 2-111 as well.

*Findings*

The findings must be set forth in some detail since petitioner has challenged the sufficiency of evidence supporting many of them. Petitioner, of course, bears the burden on this point. ■ In passing on the sufficiency of the evidence, we conduct an independent review of the record to determine whether the charges are sustained by convincing proof to a reasonable certainty. All reasonable doubts are to be resolved in favor of the attorney. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11-12 [206 Cal.Rptr. 373, 686 P.2d 1177, A.L.R.4th 1487].) The State Bar's findings, though not binding on us, are entitled to great weight. On matters of credibility, we are reluctant to reverse the decision of the hearing panel, which had the opportunity to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony. (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].)

We will address specific factual challenges to the findings in conjunction with our summary of them. Petitioner's more general challenges will be addressed after the findings have been summarized.

---

[2] Petitioner may be correct in asserting that he would not have been found culpable under the new version of the rule, since it now seems to be aimed solely at an attorney's lack of competence rather than failure to perform, which was included as subdivision (2) of the old version of rule 6-101. It was the latter provision that petitioner was found to have violated.

*Bain Matter*—In April 1980, John and Ruth Bain retained and paid petitioner $900 to represent them as plaintiffs in a civil action. Petitioner prepared and filed a four-page complaint and consulted with them on several occasions. In May 1981, the Bains became unable to contact petitioner, and they did not know the status of their case. Petitioner failed to take substantial action in the matter for which he was retained, failed to communicate with his clients and did not return the portion of the $900 fee which he had not earned. He wilfully violated his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067) in that he wilfully violated rules 2-111 and 6-101(2).

To the extent that the findings state that petitioner had not earned the $900 paid him, they are not supported by the evidence. Against Mrs. Bain's vague recollection of having met with petitioner several times, petitioner testified that his records showed he met with her on nine occasions and spent about fifteen hours on their matters. Petitioner's agreement with the Bains was that he would charge $75 per hour for his time.

*Beanblossom Matter*—In September 1979, Mr. Beanblossom retained petitioner to represent him as a defendant in a civil action for money due. He paid petitioner $753. Petitioner spent about three and one-half hours representing Beanblossom, including consulting with him three to four times and appearing at his deposition. In the summer of 1981, Beanblossom learned from a third party that a default judgment had been entered against him. He attempted to contact petitioner, but petitioner's office was closed and there was no forwarding address.

The State Bar found that petitioner did not earn the total fee paid him, failed to return the unearned part, failed to take substantial action in the matter, and failed to communicate with his client. Petitioner wilfully violated his oath and duties as an attorney in that he wilfully violated rules 2-111 and 6-101(2).

Our review of the evidence reveals that the weight of the evidence is again contrary to the finding that petitioner had not earned the total fee paid him. Against Beanblossom's testimony about three and one-half hours of meeting with petitioner is petitioner's testimony, based on his records, that he spent a total of thirteen hours representing Beanblossom. There were a number of continuances and letters that went back and forth between counsel. The time beyond meetings with the client was spent on preparation of documents, discovery, correspondence, and one or two court appearances. Thirteen hours would have consumed the fee at the $60-per-hour rate that petitioner was then charging.

*Kershaw Matter*—In February 1981, petitioner agreed to represent Mr. Kershaw in his dispute with his partner. Kershaw paid petitioner $2,000. Petitioner spent about 22 hours on Kershaw's behalf. Petitioner said he would file a lawsuit, but he never did. He failed to communicate with Kershaw after April 1981 and did not inform him he was moving.

The State Bar found that petitioner withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client. He wilfully violated his oath and duties as an attorney in that he wilfully violated rules 2-111 and 6-101(2).

*Beilby Matter*—In December 1980, Mr. Beilby retained and paid petitioner $1,000. Petitioner was to obtain an injunction regarding a water diversion problem. Upon inquiry in January 1981, petitioner said he was still doing research. Beilby's further attempts to reach petitioner were unsuccessful; his letters to petitioner were returned, marked "unclaimed."

The State Bar found that petitioner did not earn the entire fee paid him, and he failed to return the unused portion. Petitioner failed to take substantial action in the matter and failed to communicate with his client. He wilfully violated his oath and duties as an attorney in that he wilfully violated rules 2-111 and 6-101(2).

Our independent review of the record discloses that the weight of the evidence is contrary to the finding that petitioner did not earn the entire fee. Beilby's testimony about petitioner's efforts was vague and in no way more compelling than petitioner's specific testimony about the time he put in researching the matter—at least 14 hours—at the agreed upon rate of $75 per hour.

*Berg Matter*—In September 1980, Mr. Berg retained petitioner to defend him in a lawsuit brought against him by a lumber company. Petitioner learned that a default had been entered against Berg, succeeded in having it set aside and negotiated a settlement of the action.

Before the settlement was final petitioner obtained a $10,000 loan from Berg to proceed with acquiring property for a commercial development. Berg was a building contractor and wanted to handle petitioner's construction. Petitioner gave Berg a promissory note stating that he would pay $11,000 in 30 days. The loan was secured by a deed of trust, which petitioner informed Berg would be a "first second"—i.e., that there was an all-inclusive deed of trust in front of Berg's deed of trust. The term "first second" was a misnomer since there were several loans included in the all-inclusive deed of trust.

Berg filed a foreclosure proceeding when petitioner failed to repay him. At that time he had a title search done and learned for the first time that four loans had priority over his. The title search also disclosed that on February 13, four days before obtaining Berg's loan, petitioner executed a $55,000 note to Ona Chavers. The deed of trust securing that note was recorded on February 19, 1981, the same day that Berg's deed of trust was recorded. Berg's note was dated February 17.

The holder of the all-inclusive deed of trust initiated foreclosure proceedings in March 1981, before Berg initiated his. The property was sold at a foreclosure sale, and Berg lost all of his money. Petitioner has never repaid Berg.

The State Bar found that petitioner still had an attorney-client relationship with Berg at the time the loan was made. The transaction was not fair to Berg because the encumbrances against the property were not fully disclosed to Berg or transmitted in writing in a manner which could reasonably be understood by Berg. Nor was Berg given a reasonable opportunity to seek the advice of independent counsel. Berg's desire to obtain work as a result of the transaction did not relieve petitioner of his duty of fairness and full disclosure to his client.

Petitioner was found to have wilfully violated his oath and duties as an attorney in that he wilfully violated rule 5-101. Petitioner's actions were also found to have involved moral turpitude.

*Garcia Matter*—In July 1979, petitioner was retained by Mr. Garcia to represent him in a real property dispute. Petitioner told Garcia he would charge $1 per minute for his work. Garcia paid him a total of $1,080. Petitioner drafted and filed a complaint, but the complaint was never served because petitioner believed the matter could be settled by obtaining a zoning variance.

Garcia's last communication with petitioner was in February 1981; he was unable to locate petitioner thereafter. Nothing further was done on Garcia's case after February 1981.

Petitioner failed to take substantial action in the matter and failed to communicate with his client concerning the case. He did not earn the entire fee and failed to refund the unearned portion. Petitioner wilfully violated his oath and duties as an attorney in that he wilfully violated rules 2-111 and 6-101(2).

*McCann Matter*—Through a mutual friend, Marcy McCann learned in April 1981 that petitioner was in need of money to use in a real estate

development; she offered to loan him $10,000. Petitioner agreed and said he would give her a note and a deed of trust on his residence. He told McCann there was a first deed of trust already and that hers would be in second position. The loan was to be for 10 days at 19 percent interest. Petitioner executed a deed of trust in favor of McCann on June 22, 1981, and it was recorded. Thereafter petitioner borrowed another $3,000 from McCann and executed another promissory note.

When petitioner failed to repay McCann, she instituted foreclosure proceedings, had a title search done, and learned for the first time that her deed of trust was third—not second—in priority.

The State Bar found that petitioner knowingly and intentionally misrepresented to McCann that she was to receive a second deed of trust when in fact there were already two deeds of trust against his residence. He was having severe financial difficulties at the time the loan was made and did not inform McCann of this. Petitioner's actions were found to have involved moral turpitude and dishonesty.

The hearing panel appears to have overstated matters regarding petitioner's financial difficulties. Petitioner was heavily leveraged in an effort to acquire property for commercial development. At the time of the McCann loan he had been negotiating with a mortgage company and expected imminent approval of a large construction loan for development of the property. He planned to use a portion of this loan to repay McCann and others from whom he had borrowed money. The loan, though, was ultimately denied.

The record does, however, support the finding that petitioner misrepresented the status of McCann's deed of trust. McCann was very specific in testifying that petitioner told her only of the $85,000 first deed of trust on his residence. Petitioner's denial of this does not compel a contrary finding.

*Price Matter*—In March 1980, petitioner was retained by Richard Price to perfect a mechanic's lien. Petitioner filed the mechanic's lien and then later filed an answer on behalf of Price in a countersuit for damages. Sometime after July 1980, Price began having difficulty contacting petitioner. Petitioner eventually disappeared without notice.

Although petitioner earned the $903 paid him, he withdrew from employment without protecting his client's interests. He violated his oath and duties as an attorney in that he wilfully violated rules 2-111 and 6-101(2).

*Ricks Matters*—In 1980, John Ricks consulted petitioner about a third party's failure to pay for a car sold by Ricks. Petitioner called the third party and wrote one letter. He did no further work in that regard.

In January 1981, petitioner borrowed $5,000 from Ricks "to close an escrow." Petitioner gave Ricks a receipt and a promissory note. In June 1981, petitioner gave Ricks a check for $6,000 in payment of the note. Ricks hand-carried the check to petitioner's bank, where he presented it and was told that petitioner's account had been closed.[3] The loan has never been paid.

Petitioner still had the file on the matter of Ricks's sale of the car. In the file was a check to Ricks for $200. Ricks unsuccessfully attempted to contact petitioner to obtain his file and the $200 check. He was unable to do so because petitioner had disappeared, leaving no forwarding address.

There was an attorney-client relationship at the time Ricks made the loan to petitioner. Petitioner wilfully violated rule 5-101 in connection with the loan. He also violated rules 2-111 and 6-101(2) by withdrawing from employment without protecting the rights of his client.

Petitioner disputes the finding of an attorney-client relationship. He notes that Ricks never paid him any money, and he never requested any, regarding the car sale. He did not consider Ricks a client and was simply doing a favor for him. Other than the lack of payment, petitioner's services for Ricks appear to have all the earmarks of an attorney acting for a client.

*W. Matter*—In October 1980, W. retained and paid petitioner $1,000 to obtain specific performance of an agreement to sell W. a business. Petitioner prepared a complaint, forwarded it to W. and discussed changes to be made. No changes were ever made. The value of petitioner's services was less than $1,000, and petitioner never returned any of the fee paid.

In January 1981, at petitioner's request, W. loaned him $10,000. He gave W. a promissory note and a deed of trust on his residence. The loan was to be repaid in 45 days.

In April 1981, again at petitioner's request, W. loaned petitioner $24,860 on the basis that this loan was to be handled the same as the $10,000 and that it would be secured by a deed of trust. Petitioner executed a note, dated April 16, 1981, for $24,860; the note stated that it was secured by a deed of trust. Petitioner was to pay W. $25,520 within 60 days. No trust deed was ever given to W. on this loan.

Petitioner testified that he expected the deed of trust from the first loan to secure the second loan. When he repaid the first loan, the deed of trust was

---

[3] The findings erroneously state that the check was returned marked "account closed."

never reconveyed. He had given the deed of trust to W. who was to have it recorded to protect his interest. W. lost the deed of trust and never had it recorded. W.'s attempt to falsify another deed of trust and have it recorded did not taint W.'s right to repayment or excuse petitioner's conduct.

The hearing panel found that there was an attorney-client relationship when both loans were made. Petitioner should have made certain W. was protected by recording the deed of trust for W. Petitioner violated his oath and duties as an attorney in that he wilfully violated rule 5-101 in his loan transactions. Petitioner committed acts involving moral turpitude as well.

The hearing panel also found that petitioner's "failure to provide Mr. [W.] with a Deed of Trust to secure the $24,860 Note was intentional and a clear violation of Respondent's fiduciary responsibility to Mr. [W.]." The record does not clearly support this finding. Petitioner testified that the first deed of trust given W. was intended to secure the second loan and that W. was given this deed of trust but failed to record it. If this finding is intended to say that petitioner should have made sure W. was protected by recording it for him, then there is support for it.

The hearing panel further found that the client security fund should reimburse W. the sum of $24,860 plus interest at the legal rate from April 16, 1981.

*Webel Matter*—In February 1980, petitioner was retained by Mr. and Mrs. Webel to represent them as plaintiffs in an action against certain cabinetmakers. Petitioner filed a lawsuit for them and performed without problem until May 1981, at which time the Webels became unable to contact petitioner. The notice to set trial for August 13, 1981, was mailed to petitioner, who did not appear. Mr. Webel retained another attorney. Webel stated, however, that he was not dissatisfied with petitioner's representation; he filed a complaint with the State Bar because "that was the only way" he could get his file back.

Petitioner wilfully violated his oath and duties as an attorney in that he wilfully violated rule 2-111(A)(2) by withdrawing from employment without taking steps to avoid foreseeable harm to his clients.

*West Matter*—In April 1980, petitioner was retained by Steve West to represent him in a collection matter and to draft wills for him and his wife. Petitioner prepared and filed a complaint, but did nothing thereafter regarding the court proceeding. Petitioner closed his office without notifying West and gave no means of locating him. Such conduct was wilful violation of rule 2-111(A)(2).

*Yowell Matter*—Alta Yowell retained petitioner in July 1980 to represent her in a dispute with the contractor who built her house. Petitioner told her he would contact the contractor and file a lawsuit if he did not receive an acceptable response.

Sometime in 1980 petitioner falsely told Yowell that he had filed a lawsuit on her behalf. When she later checked with the court, she learned that petitioner had not filed a lawsuit for her. Petitioner's false representation to Yowell was made with the intent to deceive her.

From May 1981, petitioner failed to communicate with Yowell or to inform her of his location. Petitioner wilfully violated rules 2-111(A)(2) and 6-101(2).

*Henderson Matter*—Mr. and Mrs. Henderson retained and paid petitioner $500 in August 1979 to represent them in a claim for damage to a cabin they owned. Petitioner filed an action on their behalf but never served the defendant.

Henderson did not see petitioner after January 1981, and petitioner did not inform him that he was closing his office. Petitioner wilfully violated rule 2-111(A)(2) by withdrawing from employment without taking steps to avoid foreseeable prejudice to his clients.

*Petitioner's Agoraphobia Defense*—Petitioner presented testimony from two psychiatrists and a psychologist that at the time of his misconduct he was suffering from significant depression and agoraphobia. Agoraphobia literally means fear of the marketplace; a person suffering from it becomes so incapacitated by anxiety that he becomes unable to function and his world progressively shrinks to the point where, in extreme cases, the individual cannot talk on the telephone or go out of his house. Although the cause is not clear, one psychiatrist stated he believed it is a variant of depression and has a chemical basis.

Petitioner began treatment for this condition in March 1982, after hearing the symptoms described on a radio program. He was treated with antidepressive drugs which quickly diminished his symptoms. He also received weekly counseling. Petitioner was still taking the prescribed drugs at the time of the hearing and was continuing with his counseling. The doctors felt his prognosis was good, but acknowledged that there was always a possibility of recurrence. Should that happen, however, petitioner would be able to recognize the symptoms quickly and obtain treatment.

Based on petitioner's description of his feelings in 1980 and 1981, the doctors felt that the disease had been in effect then and had progressively

worsened. In the earlier stages agoraphobia is episodic, and a person will have good days and bad days.

The hearing panel rejected petitioner's attempt to excuse his conduct on the basis of his psychiatric condition. It concluded that such difficulties could not excuse petitioner from providing his clients with the minimum protection they needed and expected under their attorney-client relationship. The panel did, however, give separate consideration to the question of whether petitioner's depression and agoraphobia would mitigate his culpability.

*Factors in Mitigation*—The hearing panel found that neither petitioner's nor the doctors' testimony "contained any convincing basis for mitigation." In response to petitioner's claim that his abandonment of his clients was not wilful because it was due to his incapacitation as a result of his severe depression and agoraphobia, the hearing panel stated that no one had testified that petitioner had been incapacitated at all times during 1980 and 1981. The panel noted that there were periods during that time when petitioner was able to act in his own self-interest. As late as April 1981, he accepted a check for $2,000 from a client, and in June 1981, he flew with Marcy McCann to San Diego to obtain a $10,000 loan from her. Moreover, in July 1981, petitioner had the capacity to file a bankruptcy petition.

The hearing panel acknowledged that petitioner had volunteered to make restitution to everyone. It also noted that petitioner cooperated fully with the hearing panel and was remorseful. The financial difficulties he had at the time might have caused him to act in a way that he might not have acted "but for" his financial hardship.

### Recommended Discipline

As stated, the State Bar Court recommends disbarment. The recommendation was unanimous by both the hearing panel and the review department. Nevertheless, under the particular circumstances of this case, we find it too harsh.

The hearing panel appears to have given too little weight to mitigating factors. Its decision suggests that it failed to keep separate the questions of defense to the charges and mitigation of punishment. We agree that petitioner's condition should not excuse his conduct, but we do not agree with the apparent total rejection of it as a mitigating factor. The very nature of the disease—as described by the doctors—is that it is episodic in the earlier stages. Thus it is understandable that petitioner was able to function part of

the time. The point is that he was not functioning well or normally, and petitioner did not know what was wrong with him.

Petitioner testified that he began feeling strange in January 1981, and he became very depressed in May or June. He was also under a financial strain from his attempts to acquire and develop some commercial property. The bottom fell out when the large loan he had been led to anticipate receiving was denied. That happened in late June 1981.

Petitioner filed a bankruptcy petition on July 30, 1981, and the court issued a stay order restraining all creditors and court actions from proceeding without first obtaining leave from the bankruptcy court. The landlord of petitioner's office had nevertheless obtained a default judgment against him in August 1981 in an unlawful detainer action. Petitioner was locked out of his office, and his files were seized. He retained counsel and got the files released in October 1981. Petitioner stored some of the files in his counsel's office in San Bernardino and some in his house in Big Bear. He then lost possession of the files in his house when the first trust deed holder foreclosed and removed them. The files were eventually recovered in April 1982, but some were still missing.

Petitioner testified that his counsel had advised him against attempting to repay any of the complainants while the proceedings were pending to avoid any claim of suborning witnesses. He intends to pay everyone and stated that he thought he could do so by paying $1,000 per month toward restitution. Petitioner has been practicing law in Newport Beach since late 1982 with no apparent problems or complaints.

While we agree that none of these matters excuses petitioner's conduct, they do explain and mitigate much of what happened. They also point out the common elements and causes of petitioner's misconduct.

Under the circumstances of this case, we conclude disbarment is too harsh. Petitioner has no record of prior discipline, and all of the matters before us took place during the same limited time period and stemmed from the same causes. All but two of the cases cited by the State Bar in support of disbarment involved attorneys who had records of prior discipline. (*Grove* v. *State Bar of California* (1967) 66 Cal.2d 680 [58 Cal.Rptr. 564, 427 P.2d 164] [one prior]; *Ballard* v. *State Bar* (1983) 35 Cal.3d 274 [197 Cal.Rptr. 556, 673 P.2d 226] [three priors]; *In re Duggan* (1976) 17 Cal.3d 416 [130 Cal.Rptr. 715, 551 P.2d 19] [two priors]; *In re Plotner* (1971) 5 Cal.3d 714 [97 Cal.Rptr. 193, 488 P.2d 385] [one prior]; *Benson* v. *State Bar* (1975) 13 Cal.3d 581 [119 Cal.Rptr. 297, 531 P.2d 1081] [one prior].) The other two cases cited were more aggravated than the present one. (*Tarver* v. *State Bar*

(1984) 37 Cal.3d 122 [207 Cal.Rptr. 302, 688 P.2d 911] [misappropriation of clients' funds; no remorse; unrelated conviction matter pending]; *In re Freiburghouse* (1959) 52 Cal.2d 514 [342 P.2d 1] [convicted of grand theft of $20,000 of clients' money; unfavorable prognosis for attorney's compulsive behavior].)

Petitioner, on the other hand, cites cases in which less severe discipline has been imposed. In *Chefsky* v. *State Bar, supra,* 36 Cal.3d 116, the attorney misappropriated funds from one client, failed to perform services for or to communicate with several clients, and withdrew from representation without taking steps to protect his clients in four matters (there were five matters in all). We reduced the recommended one-year suspension to three years' probation with thirty days actual suspension on the ground that all of the misconduct occurred during a relatively short time period, the behavior appeared to have been aberrant, the attorney had no record of prior discipline in his twenty years of practice, he was ill at the time, was attempting to relocate his law office, and had lost his full-time secretary.

In *Chasteen* v. *State Bar* (1985) 40 Cal 3d 586 [220 Cal.Rptr. 842, 709 P.2d 861], the attorney's misconduct took place over a six-year period and included failure to perform services, commingling and misappropriating funds, and unauthorized practice of law while under suspension. He had a prior record of discipline. In mitigation, the attorney presented evidence that he had marital problems, was an alcoholic, and was seeking treatment in an ongoing alcoholism program. We placed him on five years of probation on conditions including 60 days of actual suspension, restitution to a client, and continued supervision of his employment.

In *Mepham* v. *State Bar* (1986) 42 Cal.3d 943 [232 Cal.Rptr. 152, 728 P.2d 222], we placed the attorney on five years' probation on conditions including three years' actual suspension and until he made restitution of $500 to the Client Security Fund. Although only one client was involved, the attorney had a record of three prior disciplinary proceedings. Mepham failed to perform services for which he had been retained and paid $500. The client then obtained a $500 award from fee arbitration, which Mepham failed to pay. Mepham failed to appear at a hearing he requested to present evidence in mitigation. He did appear before the review department after being notified that it was considering disbarment. There he testified that his misconduct was a result of his continuing problem with alcoholism which had resulted in hospitalization in March 1980. We noted, however, that the misconduct in question occurred after Mepham's treatment, when he was supposedly regaining control over his life.

It is our judgment that disbarment would be too harsh in light of the mitigating circumstances presented and the fact that petitioner has an oth-

erwise unblemished record both before this one aberrant period and since he began psychiatric treatment. Accordingly, we order that petitioner be suspended from the practice of law for a period of five years; that execution of the order of suspension be stayed and that he be placed on probation for a period of five years upon the following conditions: 1. That he be suspended from the practice of law in the State of California during the first 18 months of said period of probation and until he makes restitution to: Merle Berg or the Client Security Fund (if appropriate) of $10,000 plus interest at the legal rate from February 17, 1981; Marcy McCann or the Client Security Fund (if appropriate) of $13,000 plus interest at the legal rate from June 22, 1981; John Ricks or the Client Security Fund (if appropriate) of $5,000 plus interest at the legal rate from January 23, 1981; LeRoy W. or the Client Security Fund (if appropriate) of $24,860 plus interest at the legal rate from April 16, 1981;

2. That during the period of probation, he shall comply with the provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California;

3. That during the period of probation, he shall report not later than January 10, April 10, July 10, and October 10 of each year or part thereof during which the probation is in effect, in writing, to the Office of the Clerk, State Bar Court, Los Angeles, which report shall state that it covers the preceding calendar quarter or applicable portion thereof, certifying by affidavit or under penalty of perjury (provided, however, that if the effective date of probation is less than 30 days preceding any of said dates, he shall file said report on the due date next following the due date after said effective date): (a) in his first report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct since the effective date of said probation, and

(b) in each subsequent report, that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct of the State Bar of California during said period;

(c) provided, however, that a final report shall be filed covering the remaining portion of the period of probation following the last report required by the foregoing provisions of this paragraph certifying to the matters set forth in subparagraph (b) hereof;

4. That petitioner shall be referred to the Department of Probation, State Bar Court, for assignment of a probation monitor referee. Petitioner shall promptly review the terms and conditions of his probation with the probation monitor referee to establish a manner and schedule of compliance,

consistent with these terms of probation. During the period of probation, petitioner shall furnish such reports concerning his compliance as may be requested by the probation monitor referee. Petitioner shall cooperate fully with the probation referee to facilitate the discharge of the referee's duties pursuant to rule 611, Rules of Procedure of the State Bar;

5. During the period of probation, petitioner shall maintain with the Office of the Clerk, State Bar Court, Los Angeles, his current office or other address for State Bar purposes and his residence address.

6. That, except to the extent prohibited by the attorney-client privilege and the privilege against self-incrimination, he shall answer fully, promptly and truthfully to the Presiding Referee of the State Bar Court or his designee at petitioner's office or an office of the State Bar (provided, however, that nothing herein shall prohibit petitioner and the presiding referee from fixing another place by agreement), any inquiry or inquiries directed to him personally or in writing by said presiding referee or his designee relating to whether petitioner is complying or has complied with these terms of probation;

7. That he take and pass the Professional Responsibility Examination given by the National Conference of Bar Examiners during the period of his actual suspension from the practice of law;

Petitioner is ordered to comply with rule 955 of the California Rules of Court and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.

EAGLESON, J., Concurring and Dissenting.—I respectfully dissent to that portion of the majority opinion imposing an actual suspension of 18 months, with additional suspension dependent upon the length of time required to make restitution. More severe discipline is warranted in light of the severity of petitioner's misconduct and his dubious assurances of reform.

Petitioner committed a wide variety of offenses, ranging from basic violations of the oaths and duties of an attorney to outright deception. He failed to return unearned fees to Mr. Garcia and deceived Ms. Yowell into believing that he had filed a lawsuit for her. Each of these acts is a breach of fiduciary duty warranting disciplinary action. (See *Finch* v. *State Bar* (1981) 28 Cal.3d 659, 664-665 [170 Cal.Rptr. 629, 621 P.2d 253].)

Petitioner also literally abandoned 11 different clients, many of whom suffered prejudice as a result. Such habitual disregard of a client's interests,

coupled with failure to communicate with the client, are grounds for disbarment. (*McMorris* v. *State Bar* (1983) 35 Cal.3d 77, 85 [196 Cal.Rptr. 841, 672 P.2d 431].)

Most egregious, however, are the numerous affirmative acts of misconduct. The loan transactions were motivated by petitioner's quest for personal gain, and were basically unfair to the client-lenders. (See *Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 472-473 [169 Cal.Rptr. 581, 619 P.2d 1005].) Moreover, petitioner stooped to committing actual fraud in order to obtain money from Ms. McCann. Although he characterizes this transaction as a loan, it shares many of the characteristics of the crime of theft by false pretenses. (See Pen. Code, § 484, subd. (a).)

Petitioner's misconduct is not excused or mitigated by evidence of agoraphobia. Dr. Slawson, a psychiatrist, testified that petitioner's affliction began sometime in 1980 and gradually progressed until reaching its peak in 1981. Supposedly, petitioner was unable to communicate with clients in early 1981 and, towards year-end, was completely housebound. However, throughout this advanced, apparently nonepisodic stage of the affliction, petitioner managed to conduct numerous profitable financial transactions. They include: (1) accepting a $25,000 loan from W.; (2) accepting a $2,000 retainer from Kershaw; (3) accepting a $10,000 loan from McCann and flying twice to San Diego to discuss the details; and (4) negotiating a $450,000 loan with an Oceanside investment group. He also managed to file a bankruptcy petition and retain the services of an attorney during the same time period. Since petitioner's mental condition did not affect his ability to protect his own interests, his failure to protect the interests of his clients is inexcusable. Also, even assuming that agoraphobia caused petitioner to abandon his clients, nothing in the record similarly links the affliction to his misrepresentations and client loan transactions.

Finally, no mitigating weight can be attached to petitioner's promise to repay the borrowed money. As indicated in the majority opinion, petitioner's counsel advised against making restitution while disciplinary proceedings were pending. Nonetheless, petitioner failed to take other steps that would have shown a good faith intent to repay. He chose not to repay the loans before the State Bar process began, even though he spent an admittedly "tremendous" amount defending against charges which he admitted at oral argument were essentially true. Likewise, petitioner has practiced law successfully since 1982, but apparently has not set aside any money with which to pay his debts once these proceedings end.

As a practical matter, the majority's disciplinary formula may be tantamount to disbarment—if petitioner does not make restitution, his suspen-

sion continues indefinitely. However, petitioner has demonstrated an unmitigated, selfish disregard for others which simply should not be tolerated in the legal profession. Accordingly, the public is best protected by removing petitioner from the practice of law and requiring him to undergo the evaluation process of a reinstatement proceeding. (*In re Duggan* (1976) 17 Cal.3d 416, 424 [130 Cal.Rptr. 715, 551 P.2d 19].) I therefore strongly agree with the review department's unanimous recommendation that petitioner be disbarred.

Lucas, C. J., and Arguelles, J., concurred.