[L.A. No. 32118. Aug. 13, 1987.]

LAWRENCE JOHN ARDEN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Lawrence John Arden, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Vida Holguin for Respondent.

**OPINION**

**THE COURT.**—In this proceeding we review the unanimous recommendation by the Review Department of the State Bar Court that petitioner, Lawrence John Arden, be disbarred for misappropriating one client's funds, entering into an improper business transaction with a second, and wilfully failing to use reasonable diligence and judgment on behalf of a third.

Petitioner contends (1) that the hearing panel abused its discretion in denying his request to reopen the proceedings to consider new evidence, including a proposed polygraph examination of petitioner, (2) that the findings, conclusions and recommendation of discipline are not supported by the evidence, and (3) that the review department assigned too much weight to his prior record of discipline in recommending disbarment.

In light of the seriousness of the misconduct proved, petitioner's extended history of discipline stretching over a career of more than 30 years, and the

absence of substantial factors in mitigation, we adopt the review department's recommendation that petitioner be disbarred.

## I.

In an order to show cause filed on September 20, 1983, and amended on November 5, 1984, and two more such orders filed on December 14, 1983, petitioner was charged with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, and 6103), committing acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106), and wilfully violating rules 2-111, 5-101 (two counts), 6-101, and 8-101 of the Rules of Professional Conduct.[1] The charges involved petitioner's representation of three different clients over a four-year period from 1977 to 1981. Petitioner did not file an answer to any of the three notices. All the charges were subsequently consolidated before a hearing panel of the State Bar Court.[2]

After determining the evidence did not sustain the rule 2-111 count (withdrawal from employment) and one of the rule 5-101 counts (avoiding adverse interests), the hearing panel unanimously found the remaining allegations true and recommended disbarment. The review department unanimously voted to adopt the hearing panel's findings and to recommend disbarment.

## II.

Petitioner was admitted to the practice of law on January 4, 1951. He has been disciplined on three previous occasions: (1) In 1954, petitioner represented an unwed mother and the adoptive parents in an adoption proceeding. After the adoptive parents took custody of the child, petitioner tape-recorded without the mother's consent two telephone conversations in which the mother apparently demanded the return of the child or payment of money. Petitioner then made statements to the mother amounting to an implied threat to initiate prosecution against her for attempted extortion. While we found petitioner not culpable of most of the charges against him, we concluded the implied threat constituted an act involving moral turpitude and ordered a public reprimand. (*Arden* v. *State Bar* (1959) 52 Cal.2d 310, 321 [341 P.2d 6].)

(2) In 1966 and 1967, petitioner represented an out-of-state businessman who employed him to form a California corporation on his behalf. The firm

---

[1] Unless otherwise noted, all statutory references are to the Business and Professions Code. All references to rules are to the Rules of Professional Conduct.

[2] Also consolidated were two claims against the State Bar Client Security Fund which arose in connection with petitioner's alleged misconduct. The client security fund claims are not before us.

incorporated with petitioner's assistance was in actuality a dummy company which functioned as part of the client's interstate scheme to defraud investors. While petitioner did not fully recognize the fraudulent intent of his client, he did take part in the dissemination of a financial statement which he knew falsely represented the corporation's capital status and history of stock issuance. In 1972, petitioner was convicted in federal district court on one count of conspiracy to commit mail fraud (18 U.S.C. §§ 371, 1341). We concluded petitioner's offense involved moral turpitude and ordered him suspended from the practice of law for an actual term of two years. (*In re Lawrence John Arden,* Bar Misc. 3503, order filed Apr. 24 1974.)[3]

(3) During a representation which started in 1974, petitioner wilfully failed to inform a client in writing about the status of the client's pending matters when petitioner knew or should have known the client did not remember or understand the information petitioner related over the telephone. In the same representation, petitioner failed to effect a speedy resolution of the client's case or cause it to be transferred to another attorney. Petitioner was privately reproved in 1982 for failing to exercise reasonable diligence on behalf of the client.

## III.

The instant disciplinary proceeding involves three separate client matters. Because the facts are somewhat in dispute and because petitioner mainly contends the allegations against him were insufficiently proved, we set forth the facts in some detail.

### 1. *The Shugarman Matter*

In early August 1978, Lynn Shugarman and his father, Alvin Shugarman, employed petitioner to handle their $10,000 investment in a real estate venture in Redlands, California. The Shugarmans were referred to petitioner by Albert Corless, petitioner's longtime friend, business associate and client, who was also involved in the Redlands venture. While the record does not show the Shugarmans ever spoke to petitioner in person when hiring him, Lynn Shugarman testified he had two telephone conversations with petitioner in which they agreed upon the basic terms of the representa-

---

[3] In addition to the charge of conspiracy to commit mail fraud, the count under which petitioner was convicted also included charges that he had conspired to violate 18 United States Code sections 1343 (wire fraud) and 2314 (interstate transportation of fraudulent instruments). In our 1974 order suspending petitioner we cited these provisions in addition to the conspiracy and mail fraud provisions.

tion.[4] Shugarman further testified that after these conversations it was his "absolute" understanding that he had hired petitioner to represent him and his father in the Redlands venture.

In the second of these conversations, Lynn Shugarman arranged with petitioner for the deposit of the Shugarmans' $10,000 check into petitioner's client trust fund account. Shugarman testified he told petitioner that he did not trust Corless with the money and that therefore he wanted the money protected in petitioner's client trust fund account. He also testified petitioner responded that he understood the Shugarmans' concerns and that the funds would be kept in the separate trust account as they had requested.

The Shugarmans dated their check August 3, 1978, and made it payable to "L. John Arden, Trust Fund." This check is part of the record before us. The Shugarmans delivered the check to Corless so he could give it to petitioner. All parties to the transaction apparently understood that Corless and petitioner would use the Shugarmans' money, if necessary, as an earnest money deposit.

Lynn Shugarman testified that over the following month Corless and petitioner represented to him that the transaction was going forward. However, in the several months following, Shugarman learned through other sources there might be a problem with the venture because of a proposed building moratorium in Redlands. He later was informed by a broker familiar with the venture that it had collapsed.

When Lynn Shugarman contacted petitioner to request that the money be returned, petitioner told him he thought the Shugarmans had agreed to allow him and Corless to retain the money as a loan. Shugarman testified he vehemently rejected any request that the appropriate paperwork for the loan be drawn up, declaring he and his father had never agreed to a loan. The Shugarmans made several unsuccessful demands on petitioner before filing a civil suit and obtaining a default judgment against him. The judgment remains unsatisfied and petitioner has never returned any portion of the Shugarmans' money.

On August 9, 1978, after taking the Shugarmans' $10,000 check to their bank and obtaining a cashier's check for the $10,000 amount, petitioner deposited that cashier's check into his client trust fund account. That same

---

[4] Lynn Shugarman testified that in the first telephone conversation petitioner confirmed what Corless had promised: that petitioner had expertise in the real estate field, that he was familiar with banks in the area, that he believed he could obtain 100 percent financing for the project, and that he was willing to represent the Shugarmans without a fee as a favor to Corless.

day he wrote a check from that account to himself for $6,200 and marked the check "Debit: Corless." A week later he wrote a check from that account to Corless and his wife for $3,400. A third check was written that week for $400 to an uninvolved party. All three checks appear in the record before us. The amounts of the three checks total exactly $10,000.

Petitioner has asserted throughout this proceeding that the Shugarmans were never his clients and that he only agreed to deposit the money into his client trust fund account as a favor to Corless, his only client in the transaction.[5] Petitioner testified he removed the Shugarmans' money from his client trust fund account only after the Shugarmans had agreed to loan it to him and Corless. Petitioner stated that he waited to cash the check until it was apparent the earnest money would not be needed and until Lynn Shugarman signed documents evidencing the loan.

Corless corroborated petitioner's story regarding the loan. He further testified that the 100 percent bank financing was affirmed on August 7, 1978, and that thereafter it was apparent the Shugarmans' money would not be required as an earnest deposit. He testified he contacted Lynn Shugarman before August 9 and negotiated a loan in exchange for a guarantee that the Shugarmans would receive some portion of the proceeds from the project. The Shugarmans both specifically denied they had ever acquiesced to a loan or signed any note or other document to that effect.[6]

The hearing panel found that petitioner had wilfully and wrongfully commingled, misappropriated and failed promptly to repay the Shugarmans' money through conduct involving moral turpitude and in violation of rule 8-101.[7]

---

[5] On cross-examination petitioner unsuccessfully attempted to get the Shugarmans to admit they had attached a small note card to their $10,000 check stating the check was to be disbursed according to Corless's instructions. On the last day of the hearing, petitioner produced the note card and had it marked as an exhibit. However, the note card was dated September 3, 1978, long after petitioner deposited the Shugarmans' funds into his client trust fund account and removed a matching amount in the three checks. The note card evidently read: "I, Lynn E. Shugarman hereby authorize Al Corless my associate to represent my interest and welfare regarding 39 Lot Redlands/Emerich Project." Lynn Shugarman testified Corless had requested the note card to demonstrate to the bank that the Shugarmans were investors in the project. The note card was never admitted into evidence and is not part of the record before us.

[6] Petitioner produced a document he claimed was the loan document signed by Lynn Shugarman prior to August 9, 1978. However, Shugarman testified the proffered document was drawn up in October 1978, as a way of assuring Alvin Shugarman the invested money was still protected and had not been squandered; Lynn Shugarman testified there was never any intent to transform the transaction into a loan. The purported loan document, like the note card earlier mentioned (see fn. 5, *ante*) was marked as an exhibit but never admitted into evidence.

[7] As it read at the time of the Shugarman transaction, rule 8-101 provided in pertinent part: "(A) All funds received or held for the benefit of clients by a member of the State Bar . . .

## 2. *The Litchfield Matter*

Edward Litchfield had known petitioner for several years before the spring of 1981, at which time he sought petitioner's professional advice in locating a suitable business to purchase. In connection with this representation, Litchfield revealed to petitioner all his financial records.

Petitioner advised Litchfield he should attempt to purchase a restaurant which had become available. Petitioner also suggested Litchfield should obtain capital for the investment by refinancing his home. Pursuant to this advice, Litchfield borrowed nearly $25,000 by refinancing an existing second mortgage on his home. However, negotiations for the purchase of the restaurant collapsed on July 2, 1981.

The next day petitioner requested that Litchfield loan him some of the money which he had available from refinancing his home. Litchfield agreed, and on July 6, 1981, he delivered to petitioner a check for $10,000. Petitioner promised to repay the money "in a few days," but the loan arrangement had no specific terms nor was there any agreement as to the payment of interest. The only evidence of the transaction was a handwritten IOU inscribed on the back of a bank deposit slip. Petitioner did not advise Litchfield to seek the advice of independent counsel regarding the loan.

Petitioner never repaid the loan. After several unsuccessful demands for the return of his money, Litchfield instituted a civil action. After trial Litchfield was awarded judgment of $15,000 plus interest. Litchfield's attorney fees in the case amounted to $3,000. Petitioner has yet to pay any portion of the judgment.

Petitioner testified his attorney-client relationship with Litchfield had ceased when the restaurant deal fell through and that the loan had been requested and given between the two men as friends. Litchfield testified the attorney-client relationship continued at least until the following September when he conferred with petitioner about the purchase of an ice cream parlor. That transaction also collapsed, in part because of petitioner's failure to repay the $10,000 loan. Litchfield testified petitioner's failure to repay the loan caused him and his family severe financial and emotional distress.

---

shall be deposited in one or more identifiable bank accounts labelled 'Trust Account,' 'Client's Funds Account' or words of similar import . . . and no funds belonging to the member of the State Bar or firm of which he is a member shall be deposited therein or otherwise commingled therewith . . . . [¶] (B) A member of the State Bar shall: . . . [¶](4) Promptly pay or deliver to the client as requested by a client the funds . . . in the possession of the member of the State Bar which the client is entitled to receive."

The hearing panel concluded that petitioner violated rule 5-101[8] in requesting and accepting the loan from Litchfield while an attorney-client relationship existed and that the act involved moral turpitude.

## 3. *The Laur Matter*

In 1977 Richard Laur employed petitioner to represent him as plaintiff in an automobile accident case. It is not disputed that petitioner filed the action but failed to serve it upon any defendant or do anything else of significance on Laur's behalf. Laur testified he repeatedly attempted to contact petitioner about the status of the case but only met with petitioner once; he stated petitioner rarely returned his phone calls and often claimed he was too busy to give the matter any attention. Laur transferred the matter to another attorney but petitioner never delivered the litigation file; petitioner later claimed he had misplaced the file. The suit was ultimately dismissed for failure to serve the summons and complaint within three years. Laur filed a malpractice action against petitioner and obtained a judgment for $3,000 which has never been paid.

Petitioner admitted negligence in the Laur matter but claimed that his failure in the representation was not wilful. The hearing panel disagreed and found petitioner had violated former rule 6-101[9] by wilfully failing to use reasonable diligence on behalf of his client.

The review department adopted all of the hearing panel's findings as its own.

## IV.

▉ Petitioner first contends the hearing panel abused its discretion when it refused to accept his offer to take a polygraph examination and

---

[8] Rule 5-101 provides: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

[9] The present version of rule 6-101 was amended and made effective October 21, 1983. Former rule 6-101 as it read at the time of petitioner's conduct in the Laur matter provided in relevant part: "A member of the State Bar shall not wilfully or habitually . . . [¶](2) Fail to use reasonable diligence and his best judgment in the exercise of his skill and in the application of his learning in an effort to accomplish, with reasonable speed, the purpose for which he is employed. [¶] The good faith of an attorney is a matter to be considered in determining whether acts done through ignorance or mistake warrant imposition of discipline . . . ."

provide the results for the panel's consideration. Petitioner's offer of polygraphic evidence involves his testimony regarding the Shugarman matter. Petitioner has repeated his offer to this court.

Nearly three months after the matter was submitted to the hearing panel for decision and some two weeks after the hearing panel issued its findings, decision and recommendation, petitioner filed a request to reopen the proceedings for a de novo hearing. In a declaration supporting his request, he stated he was informed that Lynn Shugarman had recanted his testimony in the presence of five witnesses.

The hearing panel found the relevant portions of petitioner's declaration were inadmissible hearsay and afforded petitioner 10 days in which to submit declarations from the witnesses to Shugarman's alleged recantation. Petitioner failed to submit a single declaration. The State Bar submitted a declaration from Shugarman himself denying the recantation occurred.

Because the finding of culpability in the Shugarman matter was clearly based on the hearing panel's acceptance of the Shugarmans' testimony and its rejection of the testimony of petitioner and his witness Corless, petitioner now repeats his proposal to reopen the proceedings so that the truthfulness of his version may be tested through a polygraph examination.

In *People* v. *Thornton* (1974) 11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267] (cert. den. *sub nom. Thornton* v. *California* (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118] and disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]), this court adopted the general rule that, because the results of polygraph examinations lack the requisite level of scientific acceptance and thus are of questionable probative value, a stipulation among the parties is required for such evidence to be admissible. A similar rule has been applied in the civil context. (See *Robinson* v. *Wilson* (1974) 44 Cal.App.3d 92, 103 [118 Cal.Rptr. 569]; *Gideon* v. *Gideon* (1957) 153 Cal.App.2d 541, 546 [314 P.2d 1011].) The substance of the *Thornton* rule was recently reaffirmed by the Legislature's 1983 enactment of Evidence Code section 351.1,[10] which repudiated a decision by the Court of Appeal liberalizing the rule. (See 2 Witkin, Cal. Evidence (3d ed. 1986) Demonstrative, Experimental and Scientific Evidence, §§ 891-892, pp. 851-853, discussing *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24 [183 Cal.Rptr. 615].) While section 351.1

---

[10] Evidence Code section 351.1, subdivision (a) provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results."

applies only to criminal proceedings specifically, its enactment by the Legislature nullifying the *Witherspoon* decision reflects a continuing doubt in the law about the reliability of polygraph examination results.

In light of our concern that findings of culpability in disciplinary proceedings be based on reliable and convincing proof to a reasonable certainty (*Price* v. *State Bar* (1982) 30 Cal.3d 537, 547 [179 Cal.Rptr. 914, 638 P.2d 1311]; *Greenbaum* v. State Bar (1976) 15 Cal.3d 893, 902 [126 Cal.Rptr. 785, 544 P.2d 921]), we conclude the *Thornton* rule applies to the use of polygraphic evidence in the State Bar Court. Therefore, polygraph examination evidence is inadmissible in State Bar disciplinary proceedings in the absence of a stipulation between the attorney involved and the State Bar.[11]

Here there was no stipulation to the introduction of petitioner's proffered polygraph evidence. Moreover, the offer to provide such evidence came after the matter was submitted for decision and was accompanied by the offer of other new evidence regarding petitioner's allegation that Lynn Shugarman had recanted his testimony. As previously indicated, however, a declaration by Shugarman in the record denies any such recantation and petitioner failed to substantiate his claim of recantation with even one declaration from the five percipient witnesses he claimed there were. The hearing panel acted with full propriety in crediting Shugarman's declaration over petitioner's and in denying petitioner's request to reopen the hearing for the introduction of polygraph examination evidence.

## V.

Petitioner contends the review department's findings and recommendation are not supported by evidence in the record.

■ In attorney disciplinary matters we independently examine the record, reweigh the evidence and pass on its sufficiency. (*Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186].) However, the burden falls upon petitioner to show the action of the State Bar Court was erroneous or unlawful. (§ 6083, subd. (c); *Ramirez* v. *State Bar* (1980) 28 Cal.3d 402, 411 [169 Cal.Rptr. 206, 619 P.2d 399].) Review of the record shows petitioner has failed to sustain this burden.

Petitioner's various attacks upon the findings rely largely on and repeat the contrary evidence he presented at the hearing. He essentially asks us to credit his version of the events over the conflicting evidence. While the

---

[11] Courts in other jurisdictions are in accord. (*Committee on Professional Ethics* v. *Shifley* (Iowa 1986) 390 N.W.2d 133, 135; *Matter of Swartz* (1984) 141 Ariz. 266 [686 P.2d 1236, 1246].)

standard of review requires us to consider the evidence independently, we assign great weight to the findings below when based on conflicting testimony. The members of the hearing panel were in a superior position to evaluate conflicting statements because they could observe the demeanor of the witnesses and the character of their testimony. (*Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 736 [187 Cal.Rptr. 30, 653 P.2d 321]; *Gallagher* v. *State Bar* (1981) 28 Cal.3d 832, 838 [171 Cal.Rptr. 325, 622 P.2d 421].)

█ Notwithstanding petitioner's suggestion to the contrary, State Bar disciplinary proceedings are not governed by a reasonable doubt standard of proof as in criminal trials. The purpose of disciplinary proceedings is not to punish the attorney but rather to protect the public and the profession from the wrongful conduct of persons unfit to practice law. (*Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 886 [126 Cal.Rptr. 793, 544 P.2d 929].) There is no constitutional or statutory presumption of innocence in disciplinary proceedings. (See *Ring* v. *The State Bar* (1933) 218 Cal. 747, 750 [24 P.2d 821] and cases there cited.) However, in recognition of the gravity of the loss when an attorney's professional license is revoked, we do not consider the allegations proven unless sustained by clear and convincing evidence. (See *Golden* v. *The State Bar* (1931) 213 Cal. 237, 247 [2 P.2d 325]; see also *Price* v. *State Bar, supra,* 30 Cal.3d 537, 547.)

█ Regarding the Shugarman matter, petitioner contends the evidence shows that the Shugarmans were never his clients and that they agreed to transfer the money to him and Corless as a loan. The contention is devoid of merit. Our independent review of the record, and especially our examination of the Shugarmans' testimony, discloses clear and convincing evidentiary support for the findings (1) that the Shugarmans hired petitioner to represent their interests in the Redlands real estate venture and (2) that the Shugarmans never consented to the use of their $10,000 as a loan. The record presents substantially uncontradicted evidence that petitioner received the Shugarmans' check payable to his client trust fund account after they informed him they did not trust Corless with the money and wanted it kept in an attorney's client trust fund account for safekeeping. Petitioner's misappropriation of the Shugarmans' funds constituted a clear violation of rule 8-101.

█ Regarding the Litchfield matter, petitioner argues the attorney-client relationship was terminated by the collapse of the proposed restaurant purchase and thus, when petitioner sought the loan *the very next day,* he was not bound by rule 5-101 (see fn. 8, *ante*). However, the record contains no showing petitioner indicated to Litchfield the employment had been terminated. Further, the purpose of the representation was the location of a suitable business for Litchfield to purchase; the record indicates petitioner

assisted his client's efforts in this regard several months after the loan was advanced. We agree with the State Bar that Litchfield remained petitioner's client when the loan was requested and given. ██ ██ As the review department impliedly concluded, petitioner's conduct in requesting and accepting the loan without advising Litchfield to seek the advice of independent counsel was a clear violation of rule 5-101, one purpose of which is to protect clients from their attorneys' self-interested use of financial information gained from confidences disclosed during the attorney-client relationship.

██ Regarding the Laur matter, petitioner claims his neglect of his client's case was not wilful but only negligent and thus cannot constitute a violation of former rule 6-101 (see fn. 9, *ante*). This argument is not persuasive. Petitioner's failure for three years to cause the action to be served on any defendant involved a conscious disregard of the requirements of reasonable diligence and good judgment and cannot be said to have resulted from mere inadvertence or mistake. The record shows petitioner did virtually nothing to advance his client's cause despite receiving numerous reminders the matter was pending and required attention. It also appears petitioner was less than forthright with the client and his new attorney about the misplaced litigation file.

## VI.

██ "In arriving at a proper discipline consistent with the purpose of disciplinary proceedings to protect the public from attorneys unfit to practice (see *Schultz* v. *State Bar* (1975) 15 Cal.3d 799, 803 [126 Cal.Rptr. 232, 543 P.2d 600]), we must balance all relevant factors including mitigating circumstances on a case-to-case basis. (See *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 919 [101 Cal.Rptr. 369, 495 P.2d 1289], *Codiga* v. *State Bar* [, *supra,* ] 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186].) We also attach great weight to the discipline recommended by the board. (*Martin* v. *State Bar* [(1978)] 20 Cal.3d 717, 723 [144 Cal.Rptr. 214, 575 P.2d 757].)" (*Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 474 [169 Cal.Rptr. 581, 619 P.2d 1005].)

██ Misappropriation of a client's funds is a serious breach of professional ethics for which disbarment is the appropriate discipline in the absence of mitigating circumstances. (*Cain* v. *State Bar* (1979) 25 Cal.3d 956, 961 [160 Cal.Rptr. 362, 603 P.2d 464]; *Weir* v. *State Bar* (1979) 23 Cal.3d 564, 576 [152 Cal.Rptr. 921, 591 P.2d 19]; see *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 746-747 [111 Cal.Rptr. 905, 518 P.2d 337].) Disbarment appears all the more appropriate when an attorney guilty of misappropriation has in addition engaged in an improper business transaction with an-

other client (see, e.g., *Benson* v. *State Bar* (1975) 13 Cal.3d 581, 588-591 [119 Cal.Rptr. 297, 531 P.2d 1081]) and allowed yet another client's lawsuit to be dismissed by failing to do anything after filing the complaint (see, e.g., *Selznick* v. *State Bar* (1976) 16 Cal.3d 704, 708-709 [129 Cal.Rptr. 108, 547 P.2d 1388]). Petitioner himself has acknowledged in written and oral argument before this court that culpability in the Shugarman matter alone, if proven, would provide a basis for disbarment.

Neither the hearing panel nor the review department found any factors in mitigation. After the finding of culpability on the various charges was announced at the hearing, petitioner merely reargued the evidentiary and legal issues already decided instead of presenting evidence of mitigating circumstances. Petitioner never admitted any wrongdoing nor did he exhibit any remorse for his conduct, despite the financial and emotional injury he wreaked upon his clients in these matters. Petitioner admits he has failed to pay any portion of the three outstanding judgments obtained against him by his clients for the losses he caused.

The only mitigating factors now advanced by petitioner are his age (over 60) and his unsatisfactory financial condition.

Petitioner argues his record of previous discipline should not be accorded significant weight here. He asserts he was not found culpable on any serious charge in the 1954 adoption matter and that our order of a public reprimand for an implied threat of prosecution was based on a contrived new rule of professional conduct. Concerning the 1972 federal conviction for conspiracy to commit mail fraud, petitioner avers he was largely unaware of the central aspects of the conspiracy, that he was duped into advancing the scheme, and that the two years of actual suspension resulted from a "plea bargain" struck with the State Bar and included nearly two years of a temporary suspension he had served while the matter was pending.[12]

None of these arguments persuades us petitioner's prior record of discipline should be ignored or substantially discounted. The record indicates each of the three previous findings of culpability against petitioner was carefully reasoned and correctly decided. That he was exonerated of certain charges against him in previous proceedings and that he served most of his two-year suspension following the 1972 federal fraud conviction while that disciplinary proceeding was pending are details of little consequence here. In arriving at its recommendation as to discipline, the State Bar Court properly considered petitioner's prior disciplinary record as an important

---

[12] At oral argument petitioner suggested his 1972 federal conviction was not found by this court to constitute moral turpitude. The record reveals this suggestion was plainly erroneous.

factor in aggravation. (*McMorris* v. *State Bar* (1983) 35 Cal.3d 77, 84 [196 Cal.Rptr. 841, 672 P.2d 431], cert. den. *McMorris* v. *State Bar* (1984) 466 U.S. 958 [80 L.Ed.2d 553, 104 S.Ct. 2170]; *Marcus* v. *State Bar* (1980) 27 Cal.3d 199, 202 [165 Cal.Rptr. 121, 611 P.2d 462].)

Three times during petitioner's career he has seen his breaches of ethics lead to discipline. He has suffered a public reprimand, a private reproval, and a serious two-year suspension from the practice of law for his previous wrongdoing. Each of these disciplinary orders provided him an opportunity to reform his conduct to the ethical strictures of the profession. His culpability in the three matters presently under consideration sadly indicates either his unwillingness or inability to do so.

When viewed in tandem with his culpability in the present matters, petitioner's disciplinary record displays "a continuing course of serious professional misconduct extending over a period of several years." (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 576 [119 Cal.Rptr. 335, 531 P.2d 1119].) The risk of petitioner repeating this conduct if permitted to continue in practice is considerable, and the public and the legal profession would not be sufficiently protected by a mere suspension. (*Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131-132 [192 Cal.Rptr. 866, 665 P.2d 956]; *Ambrose* v. *State Bar* (1982) 31 Cal.3d 184, 196 [192 Cal.Rptr. 866, 665 P.2d 956].)

## VII.

Accordingly, it is ordered that petitioner Lawrence John Arden be disbarred from the practice of law and that his name be stricken from the roll of attorneys. It is further ordered that petitioner comply with the requirements of rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.