[No. S008235. Dec. 10, 1990.]

JIMMIE EUGENE CANNON, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Jimmie Eugene Cannon, in pro. per., for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Marta B. Galeano, Starr Babcock and Erica Tabachnick for Respondent.

**OPINION**

**THE COURT.**—The Review Department of the State Bar Court (review department) has recommended that petitioner Jimmie Eugene Cannon be disbarred from the practice of law in California for multiple acts of misconduct, including failure to perform services and failure to return unearned fees. Petitioner contends that the recommendation is based on erroneous findings of fact and conclusions of law. As we shall explain, most of the alleged discrepancies between the evidence and the findings relate to immaterial matters. With certain exceptions, the review department's essential findings and conclusions are supported by the evidence, and the recommended discipline of disbarment is appropriate.

Petitioner was admitted to the bar in June 1976; he has no prior record of discipline. Petitioner was charged with misconduct in two notices to show cause that were consolidated. After the hearing on the charges, a single-referee hearing panel found misconduct in five matters and recommended that petitioner be disbarred. By a unanimous vote, the review department adopted the hearing panel's findings of fact and its disbarment recommendation.[1]

We will consider the five matters in turn, summarizing the review department's findings as to each and evaluating petitioner's objections to the findings. ▆ In doing so, we independently review the evidence and pass on its sufficiency, but we give great weight to the review department's findings, especially when they are based on conflicting testimony. (*Van Sloten* v. *State Bar* (1989) 48 Cal.3d 921, 931 [258 Cal.Rptr. 235, 771 P.2d 1323].)

*The Scott Matter*

In July 1982, Gerald Scott, a citizen of Canada, retained petitioner to obtain "green card" immigration permits for himself and his family and to form a California corporation through which Scott could expand his gospel music recording business into the United States. Scott signed a retainer agreement on July 16, 1982, and seven or ten days later forwarded $2,000 to petitioner and instructed him to proceed with haste. During subsequent telephone conversations, petitioner assured Scott that the matters were proceeding and would be quickly resolved.

In September 1982, petitioner informed Scott that he had met with an Immigration and Naturalization Service officer, and that he needed further information, but that the green cards would be forthcoming in a few days. Scott telephoned petitioner several times after that conversation and left messages, but his calls were not returned. On October 30, 1982, Scott instructed petitioner to cease further work on the incorporation and green card matters and requested an accounting of the work performed to date. Petitioner informed Scott that the fees were $250 and promised to refund the balance of $1,750 within a week. Petitioner said he could not refund the money immediately as it had been invested.

Scott thereafter wrote two letters to petitioner requesting the refund of the money, then turned collection efforts over to an attorney. After sending

---

[1] In July 1988, petitioner was involuntarily enrolled as an inactive member based on a finding that his conduct, as reflected by his actions in the five matters at issue here and in an additional ten matters that are the subject of disciplinary proceedings now pending in the State Bar Court, posed a substantial threat of harm to the interests of his clients or the public. (See Bus. & Prof. Code, § 6007, subd. (c).)

three more letters to petitioner requesting repayment, and receiving no response, the attorney initiated fee arbitration with the Orange County Bar Association and won an award. Although served with the award, petitioner refused to pay. The attorney had the award reduced to a judgment, which remains unsatisfied.

Based on these findings, the review department concluded that petitioner withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client (Rules Prof. Conduct, former rule 2-111(A)(2); see now, *id.*, rule 3-700(A)(2))[2] and failed to return unearned fees (former rule 2-111(A)(3); see now, rule 3-700(D)(2)). The review department also found that petitioner violated his oath and duties as an attorney (Bus. & Prof. Code, §§ 6068, 6103)[3] and committed acts of moral turpitude (§ 6106).

Petitioner disputes the accuracy of the findings in certain particulars that are plainly immaterial to the determination of misconduct. For example, he maintains that Scott is known as "Gerry," not "Gerald," and that the findings fail to state that petitioner's secretary was present at the July 16 meeting between petitioner and Scott. These alleged inaccuracies require no further comment.

■ Petitioner maintains that he did not withdraw from employment, and that the hearing panel's conclusion to the contrary, which was adopted by the review department, is based on erroneous and incomplete findings. He also challenges the conclusion that he willfully failed to refund unearned fees, maintaining that the $2,000 fee was earned and that, in any event, he reasonably believed a $1,750 refund had been sent to Scott. We will examine the main arguments advanced by petitioner in support of these positions.

Petitioner contends that the findings erroneously fail to acknowledge that fear of double taxation of his business, rather than dissatisfaction with petitioner, was the true reason Scott instructed petitioner to cease work on the matters for which he had been engaged. The possibility of double taxation was mentioned in the retainer agreement and in letters Scott sent to petitioner, and it appears that tax considerations were a factor in Scott's decision to terminate his relationship with petitioner. Nonetheless, Scott was plainly dissatisfied with petitioner's inaction and failure to communicate.

---

[2] All references to rules are to the State Bar Rules of Professional Conduct unless otherwise indicated. The present rules took effect on May 27, 1989, after the misconduct involved here. References to former rules are to those in effect when petitioner's conduct occurred.

[3] All further statutory references are to the Business and Professions Code unless otherwise indicated.

Petitioner also challenges the finding that he agreed to obtain green card immigration permits for Scott and his family. He relies on the retainer agreement, or "Engagement Letter," signed by both petitioner and Scott, which states that petitioner is to obtain business or nonimmigrant visas for Scott and his family but also states that the holder of a business visa can apply for immigrant status after one year and that conversion from nonimmigrant to immigrant status is "virtually automatic." Given this representation, it does not appear inaccurate to state that petitioner was engaged to obtain green cards, even though it was understood he would accomplish this by first obtaining nonimmigrant visas.

In any event, petitioner fails to show that the alleged discrepancy is material. Although aware that Scott regarded the matter as urgent, petitioner failed to obtain any visas, either immigrant or nonimmigrant, or to form a corporation. Petitioner attributes his lack of success to Scott's failure to supply necessary documents and information, but he does not show he made adequate efforts to obtain the documents and information from Scott. Indeed, petitioner has submitted no persuasive evidence to establish that he made any significant efforts to accomplish either of the objectives for which he was retained. Thus the essential findings that petitioner failed to diligently perform services for his client, thereby effectively withdrawing from employment, and that Scott was entitled to a refund of unearned fees in the amount of $1,750, are supported by the record.

Petitioner maintains that his failure to return unearned fees in the amount of $1,750 does not constitute misconduct because he reasonably believed that the money had been returned. Petitioner testified at the hearing that his wife and office manager, Crucita Cannon, had shown him a money order for $1,750 made out to Scott, and that he had assumed the money order was sent to Scott. Petitioner's wife testified that she cashed the money order herself and misappropriated the funds.[4] The hearing panel rejected this testimony, noting that petitioner's wife was unable to explain how she cashed a money order made payable to Scott and that, in any event, petitioner had done nothing, after discovery of the alleged misappropriation, to make restitution to Scott. We accept the hearing panel's resolution of this disputed factual issue.

Petitioner argues at length that the fee arbitration award in Scott's favor, and the superior court judgment based on the award, are invalid because the notice of hearing was mailed to a former address, the notice was not served in accordance with statutory provisions for private arbitrations (Code Civ.

---

[4] The record reflects that petitioner's wife has been convicted of grand theft for taking some $15,000 from certain of petitioner's clients, none of whom were involved in the matters at issue here. She testified, however, that this series of thefts occurred in 1985.

Proc., § 1280 et seq.), Scott's affidavit in the proceeding did not comply with provisions governing affidavits executed in foreign countries (*id.*, § 2014 et seq.), and the petition to confirm the award should have been filed in munipical court (but see, *id.*, § 1292.2). Because this is a disciplinary proceeding to protect the public, the alleged flaws in the arbitration proceeding and resulting judgment have little relevance. The findings of misconduct are based on the evidence that petitioner did not perform the work required under the "Engagement Letter," agreed to return $1,750 in unearned fees, and has yet to reimburse his former client.

*The Godinez Matter*

In July 1985, Ermelinda Godinez telephoned petitioner's office to obtain representation for her husband, Pasqual Godinez, who was in custody on a charge of transporting illegal aliens. The person to whom she spoke told Mrs. Godinez that petitioner would represent her husband for $500. Mrs. Godinez arranged for a friend to deliver $500 to petitioner's office. She received back a signed receipt in the name of petitioner's practice, the Santa Ana Immigration Center. The next day, Mr. Godinez called petitioner from jail. Because petitioner speaks little Spanish and Mr. Godinez speaks little English, Mr. Godinez spoke primarily to petitioner's secretary, who assured Mr. Godinez that either petitioner or a representative of petitioner would appear for Mr. Godinez in court the next day.

Petitioner did not appear to represent Mr. Godinez, so Mr. Godinez accepted representation by a public defender. After his release, Mr. Godinez went to petitioner's office several times to try to get his money back, but the office manager would not give it back. The money has never been returned.

Based on these findings, the review department concluded that petitioner withdrew from employment without taking reasonable steps to avoid foreseeable prejudice to his client (former rule 2-111(A)(2); see now, rule 3-700(A)(2)), intentionally failed to perform legal services competently (former rule 6-101(A)(2); see now, rule 3-110), and failed to return unearned fees (former rule 2-111(A)(3); see now, rule 3-700(D)(2)). The review department also found that petitioner violated his oath and duties as an attorney (§§ 6068, 6103).

Petitioner's response to the charges is that he does not recall speaking to Mr. Godinez, that if he did speak to him he did not agree to represent him in a criminal matter, and that it is possible he mistakenly believed Mr. Godinez was being prosecuted in a civil rather than a criminal proceeding. He denies ever receiving $500 from Mrs. Godinez and suggests that if a

check in that amount was delivered to his office, his wife may have misappropriated it.

Petitioner cites various statements in the testimony of the Godinezes in support of his argument that they failed to appreciate the distinction between civil immigration matters and criminal prosecutions. We may assume for purposes of argument that petitioner is correct in this and also in his assertion that he does not represent clients in criminal matters. Contrary to another of petitioner's assertions, however, there is persuasive evidence that petitioner personally agreed to represent Mr. Godinez.[5] Petitioner's apparent belief that the matter was civil rather than criminal does not excuse his complete abandonment of his client or his failure to return unearned fees.

Citing his own testimony that the receipt obtained by Mrs. Godinez was not on the form customarily used in his office, petitioner maintains that his office received no money from Mrs. Godinez. But petitioner's wife testified that she received the money and signed the receipt. ■ Under established agency principles, petitioner must be deemed to have received the money paid to his law practice at his business office and received by his office manager.

Petitioner's other factual disputes are irrelevant to the substance of this case. For instance, he notes that the findings refer to his wife as "Conchita" when her name is "Crucita." None of these alleged discrepancies affects the essential findings that petitioner broke his promise to appear on Mr. Godinez's behalf and failed to return the money paid to him by Mrs. Godinez.

*The Newport Equity Matter*

In September 1981, petitioner was hired by Bernhart Pautsch and other investors to stop foreclosure on property in which they had invested. The group of investors paid petitioner $5,000 in advance. To stay the foreclosure proceedings, petitioner filed involuntary bankruptcy petitions against the two partnerships through which the investment had been made. He also held three preliminary meetings with the investors and wrote them one letter. He did not attend a bankruptcy hearing or advise his clients, who did attend the hearing, that it was unnecessary to attend. He also failed to return any of Pautsch's telephone calls, even though Pautsch left several

---

[5] Petitioner ignores the following testimony by Mr. Godinez:
"Q.  Did you personally speak to Mr. Cannon on the telephone from jail?
"A.  [Mr. Godinez]: Yes.
"Q.  What was discussed in that conversation?
"A.  Well, he just promised he was going to go [to the court hearing], and then that if he couldn't he would send a representative."

messages each month over a period of three to six months asking petitioner to call him.

The review department concluded that petitioner had intentionally failed to perform legal services competently (former rule 6-101(A)(2); see now, rule 3-110), charged an exorbitant fee (former rule 2-107; see now, rule 4-200), and failed to return unearned fees (former rule 2-111(A)(3); see now, rule 3-700(D)(2)). The review department also found that petitioner had violated his oath and duties as an attorney (§§ 6068, 6103) and committed an act of moral turpitude (§ 6106) by willfully leading the investors to believe he was performing substantial services for them when he was not and had no intention of doing so.

Not all of the review department's conclusions in this matter are supported by the evidence. The uncontradicted evidence showed that a group of individuals, including Pautsch, were limited partners in a partnership known as Newport Equity Fund Trust CCLVI, 256. The general partner was Newport Equity Funds, Inc. The limited partnership held as its only asset a $60,000 promissory note secured by a second trust deed on a single-family residence. The balance on the first trust deed loan was approximately $110,000. In making their investment, the limited partners relied on an appraisal of the property at a fair market value of $200,000.

The property owner defaulted on the first and second trust deed obligations. The limited partnership foreclosed and purchased the property at the trustee's sale. When Pautsch consulted petitioner, less than five days remained before a scheduled trustee's sale under the first trust deed. Petitioner first contacted Newport Equity Funds, Inc., about the matter, but he learned that it was apparently insolvent and either unable or unwilling to take any action to prevent foreclosure. Petitioner also researched the title at the Hall of Records in Los Angeles to ensure there were no encumbrances other than the first trust deed. Petitioner then filed involuntary bankruptcy petitions against both the limited partnership and its general partner. This had the effect of staying the foreclosure sale. After a bankruptcy trustee was appointed, petitioner consulted with the trustee regarding the selection of a receiver for the general partner. Petitioner interviewed eight to ten real estate brokers regarding a sale of the property and attempted to renegotiate the first trust deed loan. In December 1981, he met with the limited partners to determine if any one or more of them would be willing to personally assume the obligation of a renegotiated first trust deed loan. None were. The property was listed for 90 days but no offers were obtained. Eventually the property was purchased by the first trust deed lender at a foreclosure sale. The reason petitioner failed to attend the hearing on the bankruptcy petition was that there was nothing to be gained for his clients by doing so.

Although petitioner ultimately failed to salvage any of his clients' investment, we are unable to conclude that he failed to perform legal services competently. His clients lost their investment because it was made on the basis of an inaccurate appraisal of the property's value, which did not significantly exceed the first trust deed encumbrance. Had foreclosure not been imminent, petitioner could have first obtained a new appraisal of the property, and could then have been in a position to advise them they had no equity in the property to protect and that efforts to delay foreclosure would not save their investments. But there was insufficient time to obtain an appraisal and petitioner was retained, as Pautsch testified, for the express purpose of delaying the foreclosure. Petitioner's actions appear to have been reasonable under the circumstances, and the fee charged does not appear exorbitant for the services performed. Petitioner's misconduct in the matter consisted of his failure to keep his clients informed of the status of the proceedings and the nature of his efforts on their behalf.

Petitioner concedes that he failed to return Pautsch's telephone calls, but he asserts that this failure does not establish misconduct. He relies on his testimony that he was so busy and received so many calls that he refused to take or return calls and instead adopted a practice of meeting with clients personally at his office on weekends. But petitioner never advised Pautsch that his calls would not be returned or that he should come to petitioner's office on a Saturday. The evidence supports the conclusion that petitioner was remiss in failing to respond in any manner to Pautsch's telephone calls.

*The Molina Matter*

In January 1982, Octavio Molina retained petitioner to perform immigration services for himself and his wife. Molina paid petitioner $500 in advance, and was assured that petitioner would complete all the necessary paperwork as soon as possible. Two weeks later, Molina learned that the papers had not been filed. He asked that his file be returned and the fee refunded. Petitioner initially refused both requests, but a few days later he returned the file. He did not refund the fee.

Molina initiated fee arbitration with the Orange County Bar Association. Petitioner appeared at a settlement conference, but did not appear at the fee arbitration hearing. Molina was awarded $500. Although served with the award, petitioner has never paid it.

The examiner conceded that petitioner's failure to complete and file the requested immigration documents in the short space of two weeks did not establish an intentional failure to perform services in violation of former rule 6-101(A)(2) (see now, rule 3-110), but the examiner nonetheless con-

tended, and the review department concluded, that petitioner had violated former rule 2-111(A)(3) (see now, rule 3-700(D)(2)) by failing to refund the advance fee of $500 on demand. The review department also found that petitioner had violated his oath and duties as an attorney (§§ 6068, 6103) and committed an act of moral turpitude (§ 6106).

Petitioner argues, first, that he earned the $500 fee by completing the immigration papers he was retained to prepare and that he failed to file them only because Mr. Molina did not provide him with a certified copy of his marriage certificate. Petitioner asserts, as he did at the hearing, that Molina ordered him to stop work only because one of petitioner's former employees had agreed to complete the task without charge. Molina, on the other hand, testified that petitioner did none of the work for which he had been retained. The hearing panel, having observed the testimony of petitioner and Molina, found petitioner's explanation to be not credible. We accept the hearing panel's resolution of this disputed factual issue and conclude that petitioner did not perform substantial work for Molina and therefore was required to refund the unearned fee. Petitioner compounded this misconduct by failing to participate in the fee arbitration proceedings and disregarding the resulting award.

*The County Recorder Matter*

In October 1981, petitioner gave a $48 personal check to the Riverside County Recorder for recording a grant deed on behalf of a man named O'Hara. It is unclear whether petitioner was acting as O'Hara's attorney or as his friend when he executed the check. There were insufficient funds in petitioner's account to cover the check and it was returned unpaid to the recorder. The recorder made numerous attempts to collect the check and to contact petitioner, but the inquiries were ignored and the money was never paid.

The review department found that by this conduct petitioner had committed an act of moral turpitude (§ 6106) and violated his oath and duties as an attorney (§§ 6068, 6103); it specifically noted that petitioner was culpable whether he acted as an attorney or as a friend.

■ Petitioner argues that he could not have violated his oath and duties as an attorney if he was not acting as an attorney but only as O'Hara's friend. We agree that the evidence does not establish a violation of petitioner's oath and duties as an attorney; it does establish, however, that petitioner committed an act of moral turpitude by failing to pay the obligation

represented by the check, even after disciplinary proceedings were commenced.

*Evidence in Mitigation*

Petitioner testified that in 1982 he converted his practice from real estate to immigration. His immigration practice involved a high volume of clients, most of whom were relatively poor and uneducated. During the week, petitioner spent most of his time in court and in client interviews. He was available on weekends to meet with his clients to review their cases. Because of the number of his clients, and because of the other demands on his time, he relied on his employees to process incoming mail and telephone calls and to prepare immigration documents for filing. Because petitioner is not fluent in Spanish and most of his clients are Spanish-speaking, he relied heavily on his staff for interpretation of his clients' statements.

In October 1982, petitioner's wife Crucita, a naturalized American citizen born in Mexico, assumed the position of petitioner's secretary and office manager. In 1985, petitioner discovered that she was stealing money from his clients and from his practice. He removed her from his business, they separated, and petitioner filed for dissolution of their marriage. When petitioner's clients complained of lost funds, he referred them to the police. Crucita was eventually charged with and convicted of grand theft. Petitioner paid some $15,000 in restitution on her behalf to resolve the criminal proceeding.

Petitioner rehired Crucita in February 1987. They continued to live separately and the marital dissolution proceeding remained pending. Petitioner revised his office procedures so that Crucita would not have access to any funds, and he would personally review all immigration documents before filing and would open all incoming mail except legal papers relating to pending proceedings. He also required Crucita and other employees to take lie detector tests.

After considering this evidence, the hearing panel and the review department found no mitigating circumstances other than the absence of prior discipline.

*Discipline*

■ To determine the appropriate level of discipline, we must balance all relevant factors with a view to achieving the purposes of disciplinary pro-

ceedings, which are protection of the public, maintenance of high professional standards, and preservation of public confidence in the legal profession. (*Kent* v. *State Bar* (1987) 43 Cal.3d 729, 734 [239 Cal.Rptr. 77, 739 P.2d 1244]; *Arden* v. *State Bar* (1987) 43 Cal.3d 713, 726 [239 Cal.Rptr. 68, 739 P.2d 1236, 79 A.L.R.4th 559].) We generally give great weight to the review department's recommendation. (*Arden* v. *State Bar, supra,* at p. 726.)

■ In recommending disbarment, the review department relied upon the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V, Stds. for Atty. Sanctions for Prof. Misconduct)[6] and in particular on standard 2.4(a), which provides for disbarment of an attorney who has been found culpable of "a pattern of wilfully failing to perform services demonstrating the member's abandonment of the causes in which he or she was retained . . . ." We have stated that a recommendation of the review department that is consistent with the standards generally will be rejected only if we entertain grave doubts about its propriety. (*In re Billings* (1990) 50 Cal.3d 358, 368 [267 Cal.Rptr. 319, 787 P.2d 617].) Here, petitioner willfully failed to perform services only in the Scott and Godinez matters, and these two instances are insufficient to demonstrate a pattern of similar misconduct. As we have seen, the conclusion that petitioner failed to perform services in the Newport Equity matter is not supported by the record.

Although the evidence fails to demonstrate a pattern of willful failure to perform services, and for this reason the review department's recommendation is entitled to less weight than we would normally accord it, the record does clearly establish petitioner's culpability of multiple instances of serious misconduct, many of which involved moral turpitude. Disbarment is appropriate for acts of misconduct involving moral turpitude. (Std. 2.3.) Petitioner repeatedly refused to return unearned fees even after clients obtained arbitration awards and judgments against him and consistently failed to maintain communications with clients, thereby demonstrating indifference to their welfare. We also find a complete absence of substantial mitigating circumstances. Because petitioner had been in practice only six years before the first act of misconduct, the absence of prior discipline is entitled to little weight in mitigation. (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 540 [213 Cal.Rptr. 236, 698 P.2d 139].) We conclude that a suspension would afford insufficient protection to the public and to the profession, and that the review department's recommendation of disbarment is warranted.

---

[6] All further references to standards are to these provisions.

*Disposition*

Jimmie Eugene Cannon is disbarred from the practice of law in the State of California and his name is stricken from the roll of attorneys. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 953(a).)