[No. S008480. July 27, 1989.]

TIMOTHY T. CHANG, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Timothy T. Chang, in pro. per., for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Susan Leventhal for Respondent.

OPINION

**THE COURT.**—We review the unanimous recommendation of the Review Department of the State Bar Court that petitioner Timothy T. Chang be disbarred from the practice of law in California. After considering the record and petitioner's objections, we adopt the review department's recommendation.

## BACKGROUND

Petitioner was admitted to practice law in California in 1975. He worked in a law firm for a year, at an executive recruiting firm for a year, and then as a real estate agent for various companies between 1977 and 1982. From November 1, 1982, to August 31, 1983, he worked as an associate attorney at the Los Angeles law firm of Evans & Harter. The review department's recommendation stems from his mishandling of a collection matter in the fall of 1983, after he was terminated from Evans & Harter.

## THE CALHOUNE MATTER

In May 1983, Mellon National Corporation (Mellon), the holding company for Girard Bank of Pennsylvania (Girard), retained Evans & Harter in a collection matter against Pelham Calhoune, doing business as Hans Christian Anderson Yacht Club (Calhoune). Calhoune had evidently received an overpayment of $85,000 from Girard; though he agreed to return the sum, he refused to pay any interest. The fee arrangement between Evans & Harter and Mellon, confirmed in letters to the firm from Keith James, Mellon's legal counsel, on May 10 and May 23, stipulated that Mellon would pay for the firm's services on an hourly basis, and that one of the firm's associates would do the majority of the work on the matter.

The firm assigned the case to petitioner. By the end of June, he had negotiated a settlement with Calhoune. He notified James that Calhoune had already sent him $10,000, and that Calhoune had agreed to return the remaining $75,000 plus interest and costs. He then sent Mellon a check for $10,000 drawn on the firm's client trust account.

On August 9, Calhoune sent petitioner $78,984, the amount remaining on his obligation to Mellon. Petitioner did not deposit the money in Evans & Harter's client trust account, however, as he had done when he received Calhoune's first check. Instead, without the firm's knowledge or authorization, he opened a trust account in his own name at another bank and deposited the check there. Though he notified Mellon of the account number and location, he did not mention that it was not the firm's normal client

trust account or that he was the sole signatory. He also did not immediately forward the money to Mellon, as he had done with Calhoune's first payment.

When petitioner learned that the firm was terminating his employment, he sent James a letter informing him that he was leaving Evans & Harter as of August 31. He explained that he expected the matter to be resolved before he left the firm, but if not, that Harter, a partner of the firm, would thereafter handle the case. At this time, the only work left to be done on the case was the execution of a mutual release form by Calhoune and Mellon and the settlement of Evans & Harter's legal fees. Nonetheless, petitioner was unable to obtain a signature on the mutual release by August 31. Because so little work remained to be done, petitioner contacted James and told him that he would obtain the mutual release and review the accuracy of Evans & Harter's bill for services free of charge.

James then informed Harter that petitioner would do all further work on the case, which James represented as being "very close to resolution." He also requested a detailed statement of the firm's bill for services on the matter.

Petitioner soon obtained Calhoune's signature on the release form. On September 12, he forwarded the release to Mellon, along with a check for $71,616.87, which represented, according to petitioner, "90% of the original deposit made by Mr. Calhoun [sic], or $71,085.95, plus 100% of the interest earned, or $530.92." Even though James never authorized him to do so, petitioner retained $7,898.44 as payment for Evans & Harter's legal services, and stated that he would return any excess to Mellon once the final bill was resolved. In the same letter, he confirmed the billing agreement between himself and Mellon: "As I stated, my limited efforts to settle this matter since September 2, when I left Evans & Harter, have been and will be done on a courtesy basis."

James returned the signed release form to petitioner on September 13. He also asked petitioner to repeat his earlier request to Evans & Harter for a more detailed billing statement, review the charges, and advise Mellon of their accuracy. He did not object to petitioner's retention of $7,898.44 to cover Evans & Harter's fee.

On September 15, petitioner requested the billing information from Harter.[1] Harter sent him a revised invoice the next week, listing $4,444.97 as the total amount of legal fees due from Mellon.

At this time, $7,898.44 of Calhoune's $78,984 remained in petitioner's trust account. By checks made payable to himself, petitioner withdrew $3,228.69 on October 10 and the remaining balance of $4,892.14 on December 28.

Petitioner sent James a "final accounting" on December 28,[2] in which he, for the first time, contended that he was entitled to legal fees from Mellon for his work on the Calhoune matter. In fact, he had already appropriated the $7,898.44 from the trust account, which was supposedly reserved for payment to Evans & Harter, as payment toward his "bill." His letter stated that "in the absence of an express agreement [between] myself and your client and Evans & Harter and your client, it is necessary to make a reasonable estimate of the value of services rendered on Girard Bank's behalf." He claimed that Mellon owed him a contingency fee for the work he did on the matter after leaving Evans & Harter, while it owed Evans & Harter payment for services rendered prior to his departure from the firm. Mellon allegedly owed him $8,429.36 as the remainder of his "contingency fee": "As to the $71,616.87, although the normal fee on a contingency basis is 33 1/3%, I am willing to reduce this percentage to 20%, or $15,796.88, meaning there is a balance still owing of $8,429.36 [sic]. Concomitantly, as [to] the $10,000 I agree to hold your client harmless from any claim for attorney's fees from Evans & Harter. In other words, I will take the responsibility for any compensation for which Evans & Harter may be entitled to as the result of any agreement resulting from my negotiations with Gene Harter." He would thus pay Mellon's legal fee to Evans & Harter out of his supposed contingency fee.

Harter requested payment of Mellon's bill on January 3, 1984, noting that its account was "quite overdue." He told Mellon that petitioner had never contacted him to negotiate the bill, and that, in any case, the firm would not reduce the amount due.

In response to petitioner's letter of December 28, James sent a letter to petitioner outlining Mellon's concerns regarding its fee arrangement with

---

[1] Petitioner asked Evans & Harter for information regarding "the exact number of hours spent on each listed item of work, and the name of the attorney performing said work along with that attorney's hourly rate" despite the fact that he himself had done over 90 percent of the work on the matter.

[2] The record does not reveal any communication between petitioner, James and Harter from September 21 to December 28.

him and its bill with Evans & Harter. He adamantly denied ever agreeing to pay petitioner a contingency fee: "I strongly object to your express assumption that your services were rendered on a contingency basis . . . particularly since, at the time of your departure from the Evans & Harter firm, the only open item on the agenda was the issue of attorney's fees. . . . My charge to you at that time was to obtain a revised invoice and review it for its accuracy. Certainly you do not mean to suggest that my client now owes you $15,796.88 for this simple task."

Though petitioner had agreed to resolve the matter free of charge, James agreed to pay him at his normal hourly rate for any work he performed on the case after leaving Evans & Harter out of "our anxiety and our desire to conclude the matter." James also questioned petitioner regarding his lack of progress on negotiations over the Evans & Harter bill. He explicitly instructed petitioner to pay the firm $4,444.97 out of the funds remaining in his trust account, and to send him a copy of the check, the transmittal letter and all bank statements. He concluded by threatening to "pursue other avenues of recovery of the balance of the funds" if he did not receive all of the requested documents within a week. (He later extended this deadline by a week, so that petitioner could attempt to negotiate a lower legal bill from Evans & Harter, after petitioner represented to him that the bill was "overstated somewhat.")

Harter then wrote to petitioner requesting a check for $4,444.97 so that Evans & Harter could close Mellon's account, as well as asking for the return of the Calhoune file.

On January 23, petitioner sent Mellon a "revised invoice" which stated that he was not charging Mellon for the services he rendered up to that date, and that he would not charge Mellon for any future work "assuming that no litigation will be involved." He did not, however, send any money to Evans & Harter or any bank statements to Mellon.

Mellon made two more formal requests to petitioner to obtain the balance from his bank account. In a letter dated February 3, Mellon's senior attorney directed petitioner "to immediately discontinue negotiation with Evans & Harter regarding their fee charged for this case," and "to immediately send a check to Evans & Harter for the full amount of the fee ($4,444.97), and send the balance in the trust account to us . . . ." An associate general counsel sent a second letter on March 5 noting that petitioner had failed to respond to the February 3 letter or "numerous telephone calls" and requesting the immediate return of all funds to Mellon, from which Mellon would pay Evans & Harter directly. Petitioner never responded to Mellon's queries, never gave any of the $7,898.44 to either

Evans & Harter or Mellon, and never sent Mellon any of his bank records. Mellon eventually paid Evans & Harter out of its own funds in April 1984, and then filed a complaint with the State Bar against petitioner.

## STATE BAR COURT PROCEEDINGS

The State Bar instituted an investigation into petitioner's handling of the Calhoune case in early 1985. In a letter to the State Bar's investigator, petitioner asserted that Mellon had retained him in September 1983 to collect the overpayment to Calhoune and to settle the fee dispute with Evans & Harter, whom he characterized as Mellon's "former" counsel. He stated that he collected the money from Calhoune on September 9, and that the fee dispute was resolved when Mellon, without his knowledge, paid the law firm directly. He claimed that Mellon had not cooperated, and had in fact interfered, with his efforts to negotiate the Evans & Harter bill. He also stated that Mellon had agreed to pay him 10 percent of its recovery from Calhoune. Though he told the investigator that he had made two withdrawals from his trust account (and in fact enclosed photocopies of the cancelled checks), he claimed that the sum represented his lawful fee for services. He further asserted that he had planned on reducing his fee because Mellon promised to refer additional legal business to him; when Mellon failed to do so, he decided to collect the full amount. He painted a very skewed picture of the matter for the investigator: "In sum, a disgruntled client had decided that an agreed-upon 10% fee was excessive and sought reimbursement from me."

Based on these misrepresentations, the investigator concluded that insufficient grounds existed for disciplinary action, and closed petitioner's file in May 1985. Mellon, however, sent several documents to the State Bar in early August which directly contradicted petitioner's characterization of the dispute. Based on this new evidence, the State Bar reopened the case, issuing a notice to show cause on December 10, 1986. Hearings took place before the State Bar's hearing panel in February and March 1988, during which petitioner was represented by counsel.

Petitioner made two motions on the first day of the hearing. He first moved to continue the date of the hearing in order to give his attorney, whom he had retained less than a week before the hearing, adequate time to prepare his defense. The hearing panel denied petitioner's motion for two reasons. First, petitioner had severed his relationship with his original attorney over a year before the scheduled date of the hearing, and did not offer any reason for waiting until the 11th hour to obtain new counsel. Second, the hearing was scheduled to recess for a month after the first two days of testimony in order to accommodate the schedules of certain witnesses; the

referee noted that petitioner's counsel could use this time to further acquaint himself with the file.

Petitioner also moved to dismiss the case for lack of jurisdiction on the ground that the investigator's closing of petitioner's file barred further disciplinary proceedings by the State Bar. Petitioner cited the version of rule 511 of the State Bar Rules of Procedure in force at the time, which barred further action against an attorney once the State Bar's examiner has terminated a matter. The hearing panel denied petitioner's motion. After finding that the motion was untimely made, it proceeded to distinguish between an examiner, who has the authority under former rule 508 to terminate a matter, and an investigator, who "is not the designated type of employee whose conduct bars further prosecution."

The hearing panel issued its final decision on May 9, 1988, in which it concluded that petitioner had wilfully misappropriated funds due Mellon, failed to render an accounting to Mellon, misrepresented facts to Mellon, and misrepresented facts to the investigator of the State Bar, in violation of former rule 8-101 of the Rules of Professional Conduct, and sections 6068, 6103 and 6106 of the Business and Professions Code. It also concluded that petitioner's misconduct involved moral turpitude and dishonesty.

The hearing panel noted that the State Bar had not previously disciplined petitioner, but it did not consider his lack of a prior disciplinary record a mitigating factor because of the seriousness of his present misconduct. It also did not give weight to the testimony of petitioner's character witness, because the witness was not aware of the nature of petitioner's misconduct. In addition, the hearing panel described petitioner's behavior during the hearing as demonstrating "a total indifference" toward "rectification or atonement" and "a total lack of candor" before the State Bar. It found that his misconduct "significantly harmed the client, the public and the administration of justice." In sum, it stated that petitioner had undertaken "a course of conduct designed to conceal his misappropriation of money for several months and actively misled the State Bar during the investigation portion of the proceedings . . . ." The hearing panel recommended that petitioner be disbarred.

When the matter came before the review department, petitioner moved to recuse all members of the department sitting on his case who had been appointed between 1984 and 1987, or who had a personal or professional relationship with Orville Orr. Orr was a member of the review department during those years, and had been retained by Mellon to file its complaint against petitioner with the State Bar. Petitioner relied on rule 231 of the State Bar Rules of Procedure, which forbids members of the review depart-

ment from representing a party before the State Bar Court during their term of office and for six months after they leave. The review department concluded that any member of the department who felt that his association with Orr affected his ability to act impartially toward petitioner should recuse himself from the case. Only one member of the department elected to do so.

Upon consideration, the review department adopted the hearing panel's findings and conclusions. It reclassified petitioner's misconduct as follows: His misappropriation of Mellon's funds constituted a wilful violation of former rules 8-101 (A)(2), (B)(3) and (B)(4) of the Rules of Professional Conduct; his failure to render an accounting to Mellon, along with his unauthorized deposit of the money into a private checking account, constituted a wilful violation of his oath and duties as prescribed by sections 6067 and 6068 of the Business and Professions Code; and his misappropriation, failure to render an accounting and misrepresentations to the State Bar investigator constituted acts of moral turpitude and dishonesty under section 6106 of the Business and Professions Code. The review department unanimously accepted the hearing panel's recommendation of disbarment. Six of the fourteen members noted four additional factors warranting disbarment: Petitioner's failure to make restitution to Mellon, his failure to admit that he misappropriated the funds, the fact that the misappropriation was deliberate rather than the result of negligence or inexperience, and petitioner's lack of candor with the State Bar.

## DISCUSSION

Before this court petitioner repeats the procedural arguments made in his motions before the hearing panel and review department, while ignoring the substantive question of his misappropriation of client funds. ■ First, he argues that the hearing panel should have granted his motion for a continuance. Rule 1131 of the Rules of Practice of the State Bar Court governs the granting of continuances. Subdivision (a) emphasizes that continuances are disfavored, and subdivision (d) states that they should be granted only upon an affirmative showing of good cause. Subdivision (d) further states that "the necessity for the continuance should have resulted from an emergency occurring after the setting of the conference, hearing or argument date that could not have been anticipated or avoided with reasonable diligence" and specifies several factors relevant to the decision to grant or deny a continuance.

Petitioner could have avoided the "emergency" of having his attorney unprepared at the hearing by retaining new counsel at an earlier date. Petitioner severed his relationship with his original attorney over a year

before his hearing and received his file from the attorney at least four months before the hearing. In holding that the hearing panel properly denied petitioner's request for a continuance, we rely on the fact that petitioner was not diligent in avoiding the necessity of a continuance (State Bar Court Rules of Practice, rule 1131(d)(2)), that his new counsel made the request at the latest possible moment (rule 1131(d)(4)), and that the State Bar had gone to great expense to fly in an out-of-state witness (rule 1131(d)(10)). (Cf. *Kennedy* v. *State Bar* (1989) 48 Cal.3d 610, 616 [257 Cal.Rptr. 324, 770 P.2d 736]; *Frazer* v. *State Bar* (1987) 43 Cal.3d 564, 567-568 [238 Cal.Rptr. 54, 737 P.2d 1338].)

■ Petitioner also repeats his argument that former rule 511 of the Rules of Procedure of the State Bar precluded the State Bar from reopening its case against him once the investigator closed it.[3] We disagree. The State Bar was not precluded from reopening the case. First, the investigator based his decision to close petitioner's file on blatant misrepresentations by petitioner. In his March 23, 1985, letter, petitioner misrepresented to the investigator that Mellon had agreed to pay him 10 percent of its recovery from Calhoune and that it agreed to refer him additional legal work. As the investigator later communicated to petitioner, he reopened the investigation based on documents later received from Mellon demonstrating that Mellon neither agreed to pay petitioner on a contingency fee basis nor to refer him additional work. Petitioner may not rely on his own misrepresentations to attempt to block an investigation by the State Bar.

Moreover, the State Bar Rules of Procedure in place at the time of the State Bar's investigation did not bar the reopening of the case. Former rule 511 stated that a decision of the "examiner" not to institute formal proceedings against a member acts as a bar to later proceedings based on the same facts. The individual assigned the responsibility of investigating petitioner's involvement with Mellon, however, was merely an "investigator" without the authority to close a case for purposes of barring further action. Former rule 512 explicitly authorized the chief trial counsel of the State Bar to reopen a matter within two years if he determined that the State Bar should conduct further investigation. (See fn. 3, *ante*.) The investigator's letter to petitioner informing him that the State Bar was reopening its investigation was written on stationery from the office of trial counsel; the record therefore supports a finding that the chief trial counsel ordered the reopening of

---

[3] Rule 511 read: "Except as provided in Rule 512, the decision of an examiner that a formal proceeding shall not be instituted is a bar to further proceedings against the member based upon the same alleged facts."

Rule 512 provided in pertinent part: "The rule stated in Rule 511 does not apply if . . . in the case of a decision by an examiner, the chief trial counsel determines within two years of such determination that further investigation should be conducted. . . ."

petitioner's case and that his action comes within the exception established in former rule 512.

■ Petitioner also reasserts that the review department should have disqualified all members who were appointed during Orr's tenure or who knew Orr. We find no merit in petitioner's contention that rule 231 of the State Bar Rules of Procedure requires such a wholesale recusal of referees.[4] First, Orr had left the department before it began its review of petitioner's case. In addition, he was retained by Mellon merely to *file* its complaint with the State Bar against petitioner; he did not *prosecute* the State Bar's case against petitioner. Therefore, none of his actions violated rule 231.[5]

We also find no merit in petitioner's more general contention that Orr had somehow influenced the State Bar to reopen its case in 1985 and to recommend disbarment. He has pointed to no evidence in the record of any improper influence on the investigator, hearing panel or review department by Orr, and our own perusal of the record reveals no such evidence of nefarious activity. We will not discredit the decisions of the State Bar on unsupported allegations and speculation. ■ Moreover, the fact that this court undertakes an independent review of the evidence might well counterbalance any improper influence that a complainant's attorney may have had on the State Bar. (Cf. *Hamilton* v. *State Bar* (1979) 23 Cal.3d 868, 878 [153 Cal.Rptr. 602, 591 P.2d 1254]; *Sodikoff* v. *State Bar* (1975) 14 Cal.3d 422, 431 [121 Cal.Rptr. 467, 535 P.2d 331].)

■ Petitioner's final contention relates to the credibility of the testimony of James, Mellon's former counsel. He first asserts that James denied hiring petitioner on a contingency fee basis in order to cover up his own culpability in entering into an unauthorized fee arrangement with an outside attorney. The record, however, supports a finding that James never agreed to a contingency fee arrangement. Petitioner also points to a letter written to him by James in which James expressed his satisfaction with the work petitioner had done for Mellon. Petitioner contrasts this letter with James's testimony before the hearing panel implicating petitioner in the misappropriation of money from Mellon. He concludes that "Mr. James' radical change in testimony was motivated by a fear in disclosing his own wrongdoing." Once again, petitioner has failed to prove that James ever

---

[4]Rule 231 provides in pertinent part: "[R]eferees of the State Bar Court . . . shall not represent any party to any matter before the State Bar Court during their term of office and until at least six months have elapsed after expiration of the term for which he or she was appointed, elected, assigned or employed."

[5]We note also that petitioner never alleged that any of the 14 referees who reviewed his case had actually been appointed during Orr's term in the department or that any of them actually knew him.

committed any "wrongdoing" which he sought to cover up. James gave his testimony to the hearing panel under oath, and the referees of the hearing panel were in the best position to judge his veracity. Moreover, at the time of his testimony James was no longer an employee of Mellon and hence would have no reason to "cover up." We defer to the hearing panel's judgment of the witnesses' credibility. (See *Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 133 [207 Cal.Rptr. 302, 688 P.2d 911].)

In short, petitioner misappropriated Mellon's funds without Mellon's knowledge or permission. Petitioner told the hearing panel that James had agreed to pay him a contingency fee for the work he did after leaving the firm. But his statement that he was creating a contingency fee arrangement "in the absence of an express agreement" contradicts the contention that Mellon had agreed to pay him any amount whatsoever. In addition, his earlier representation that his work on the matter would be done "on a courtesy basis" conflicts with this contention. He has produced no evidence, beyond his own assertions, that Mellon ever offered him a contingency fee.

James vehemently denied agreeing to retain petitioner on a contingency fee basis, telling the hearing panel that Mellon only hired outside attorneys on an hourly basis. He also testified that the bank would never have agreed to pay an attorney over $15,000 for the simple tasks of obtaining signatures on a mutual release form and negotiating a fee dispute. Moreover, it is unlikely that Mellon would have agreed to pay petitioner a contingency fee *after* the amount owed to Mellon had been established and collected from Calhoune, or that it would have agreed to pay him such a fee for services rendered while he received a salary from Evans & Harter. Substantial evidence in the record supports the hearing panel's finding that Mellon never agreed to pay petitioner a contingency fee; in short, petitioner misappropriated funds belonging to Mellon.

### DISPOSITION

When determining the appropriate level of discipline for an attorney who has violated the ethical standards of the legal profession, we undertake an independent examination of the record. In so doing, we give great weight both to the disciplinary recommendations of the review department and the factual findings of the hearing panel. Moreover, the attorney bears the burden of showing that the review department's recommendation is erroneous or unlawful (Bus. & Prof. Code, § 6083, subd. (c)), or that the hearing panel's findings are not supported by the record. (*Kennedy, supra,* 48 Cal.3d at pp. 616-617.)

Petitioner has not overcome that burden. He clearly violated the standards of conduct for a member of the State Bar in his handling of the

Calhoune case. Even if we accept his characterization of the matter as a "fee dispute," former rule 8-101(A)(2) of the Rules of Professional Conduct specifically forbade him from appropriating Mellon's funds before the dispute was resolved.[6] In addition, petitioner failed to comply with Mellon's numerous requests for copies of his bank records, in violation of former rule 8-101(B)(3) and sections 6067 and 6068 of the Business and Professions Code, and failed to comply with Mellon's requests for the remainder of the money received from Calhoune and the money owed to Evans & Harter, in violation of former rule 8-101(B)(4).

Petitioner's lack of candor with the State Bar's investigator and with the hearing panel is an independent ground for discipline. Subdivision (i) of section 6068 of the Business and Professions Code places a duty on an attorney "[t]o cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against the attorney." His misrepresentations to the investigator fraudulently delayed the State Bar's investigation of his misconduct, and his evasiveness before the hearing panel hindered that body's fact-finding function. ■ We have held that fraudulent and contrived misrepresentations to the State Bar may perhaps constitute a greater offense than misappropriation. (*Cain* v. *State Bar* (1979) 25 Cal.3d 956, 961 [160 Cal.Rptr. 362, 603 P.2d 464].)

■ As we have repeatedly stated, misappropriation of a client's funds is a grievous breach of an attorney's professional ethics. Not only does it harm the individual client whose money has been taken, it also endangers the confidence of the public at large in the legal profession. In all but the most exceptional of cases, we must impose the harshest discipline for such a breach in order to safeguard the citizenry from unethical practitioners. (*Bambic* v. *State Bar* (1985) 40 Cal.3d 314, 323 [219 Cal.Rptr. 489, 707 P.2d 862]; *Gordon* v. *State Bar* (1982) 31 Cal.3d 748, 757 [183 Cal.Rptr. 861, 647 P.2d 137]; Bus. & Prof. Code, § 6106.) More specifically, standard 2.2(a) of the Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V) provides that an attorney shall be disbarred for wilful misappropriation of a client's funds, absent mitigating circumstances, unless the amount taken is "insignificantly small."

■ Petitioner misappropriated over $7,000, which we find to be significant, and has offered no mitigating evidence. Although he has no prior

---

[6]Rule 8-101(A)(2) provides in pertinent part: "However, when the right of the member of the State Bar or firm of which he is a member to receive a portion of trust funds is disputed by the client, the disputed portion shall not be withdrawn [from the client trust account] until the dispute is finally resolved."

disciplinary record and this matter appears to be an isolated instance of misappropriation, we have several reasons to doubt whether he will conform his future conduct to the professional standards demanded of California attorneys. First, even at this late date he has never acknowledged the impropriety of his conduct toward Mellon and Evans & Harter. (*Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 197 [242 Cal.Rptr. 196, 745 P.2d 917].) Second, he has made no effort at reimbursing Mellon. (*Kennedy, supra,* 48 Cal.3d at p. 617.) Finally, his lack of candor before the State Bar manifests a disrespect for the bar's authority. The risk that petitioner may engage in other professional misconduct if allowed to continue practicing law is sufficiently high to warrant his disbarment. (See *Kennedy, supra,* 48 Cal.3d 610 [attorney disbarred for misappropriating over $10,000 and making no efforts at restitution]; *Tarver, supra,* 37 Cal.3d 122 [attorney disbarred for misappropriating funds and using client's signature without authorization]; *Rogers* v. *State Bar* (1980) 28 Cal.3d 654 [170 Cal.Rptr. 482, 620 P.2d 1030] [attorney disbarred for misappropriating over $9,000, refusing to communicate with clients, and misleading them as to the status of their funds].)

Therefore, it is ordered that Timothy T. Chang be disbarred from the practice of law in California, that his name be stricken from the roll of attorneys, that he comply with rule 955 of the California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. Failure to comply with rule 955 may result in imprisonment. (Bus. & Prof. Code, § 6126, subd. (c).) This order is effective upon the finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

**MOSK, J.,** Concurring and Dissenting.—I agree that petitioner's conduct in handling the Calhoune matter was devious and unprincipled. I also agree that he has not been candid with the State Bar in its investigation and hearings.

However, these were several aspects of *one* disputed transaction involving *one* client and *one* law firm. There is no extended pattern of dishonesty or deceit indicating a consistent course of conduct, or any convincing evidence that petitioner is a practitioner unworthy of trust by the public generally.

Therefore I would not disbar petitioner. Rather I would suspend him from practice for two years and place him on probation for an additional

period of time thereafter, with the usual State Bar conditions, including a requirement of complete restitution.